**In re GRAND JURY PROCEEDINGS.**

**Appeal of Robert E. YOUNG.**

**No. 83–1106.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 16, 1983.

Decided Aug. 26, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 27, 1983.

Rodney S. Webb, U.S. Atty., Gary Annear, First Asst. U.S. Atty., Fargo, N.D., for appellee.

Frank T. Knox, Frank L. Racek, Fargo, N.D., for appellant.

Before HEANEY, Circuit Judge, GIBSON and ROSENN,* Senior Circuit Judges.

ROSENN, Senior Circuit Judge.

This appeal raises several nettlesome questions pertaining to appellant's right to regain property seized pursuant to a search warrant that was issued as part of a federal grand jury investigation of his business affairs. Appellant Robert Young operates five separate businesses, one of which is the Bob Young Bonding Company, an unincorporated bail bonding business in Fargo, North Dakota. In the course of a joint investigation by the Federal Bureau of Investigation (FBI) and the Internal Revenue Service (IRS) of Young's activities, the FBI obtained a search warrant for the premises of his bail bonding business and executed the warrant by seizing sixteen boxes of various records. Young moved in the United States District Court under Fed.R. Crim.P. 41(e)[1] for the return of the property seized, claiming that the warrant authorized a general exploratory search in contravention of the fourth amendment and that the supporting affidavit for the warrant was constitutionally defective. The district court rejected each of Young's constitutional arguments and he appealed.[2] We reverse.

## I.

Following receipt in 1981 of information that the appellant had engaged in criminal misconduct in his entrepreneurial activities, the FBI and the IRS in 1982 engaged in a joint investigation and information gathering to determine whether Young had violated any federal law. One facet of the investigation focused on Young's bail bonding dealings between criminal defendants who were clients of the Bob Young Bonding Co. and two surety companies, First Heartland Surety and Casualty Insurance Co. and Minnesota Trust Co., for which Young purportedly acted pursuant to powers of attorney. The Government interviewed numerous clients of the Bob Young Bonding Co., as well as other persons, and subpoenaed records of banks and the two surety companies. The records of these bonding surety companies indicated that certain bonds issued by appellant Young had been marked "void." This aroused the Government's curiosity as to whether the bonds had genuinely been voided or whether appellant Young had actually collected premiums for the bonds that he improperly appropriated to his own use. Because Young refused the request of investigating agents to produce voluntarily records of his bonding business, federal agents sought a warrant to search the office of Young's bail bonding business in Fargo. A United States magistrate issued the warrant on November 15, 1982, on the basis of an affidavit by FBI Agent Brent Frost. Federal agents executing the warrant seized the sixteen boxes of records and removed them to the offices of the IRS for storage. A large portion of these records are still in the Government's possession, although the Government has allowed Young access to these records from time to time.

Young moved in the district court for the return of the records, contending that the search and seizure violated his fourth amendment rights because the affidavit in support of the search warrant was constitutionally insufficient and because the warrant authorized a general exploratory search of all his bail bonding records for the

---

* The Honorable Max Rosenn, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. Fed.R.Crim.P. 41(e) provides in pertinent part:

   A person aggrieved by an unlawful search and seizure may move the district court ... for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized.... If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing ... after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

2. Appellant also maintained that in his affidavit, FBI Agent Brent Frost made several statements in reckless disregard for their truth. In view of our disposition of the case, we do not address this issue.

past seven years. The district court denied the motion, holding that the affidavit adequately established probable cause for the issuance of the warrant and that under the circumstances of the case, the warrant did not authorize a general search. We disagree.

## II.

The threshold question that we must examine, a question not raised by the parties but on which we have requested supplemental briefing, is whether the district court's ruling on the Rule 41(e) motion for the return of the records is an appealable order. *DiBella v. United States,* 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962), which sets forth the general guiding principle, involved two criminal defendants who, subsequent to their arrest, filed motions under the predecessor to Rule 41(e), seeking the return of property that had been seized from them and its suppression as evidence. While the motions were pending, each defendant was indicted. The Supreme Court held that the district court orders denying the Rule 41 motions were interlocutory and hence unappealable, explaining that to permit such interlocutory appeal of a suppression motion would disrupt the ongoing criminal proceedings.

> Presentations before a United States Commissioner, as well as before a grand jury, are parts of the federal prosecutorial system leading to a criminal trial. Orders granting or denying suppression in the wake of such proceedings are truly interlocutory, for the criminal trial is then fairly in train. When at the time of ruling there is outstanding a complaint, or a detention or release on bail following arrest, or an arraignment, information, or indictment—in each such case the order on a suppression motion must be treated as "but a step in the criminal case preliminary to the trial thereof." Only if the motion is solely for return of property and is in no way tied to a criminal prosecution *in esse* against the movant can the proceedings be regarded as independent.

*Id.* at 131–32, 82 S.Ct. at 660–61 (citations omitted).

In interpreting the teaching of *DiBella,* most courts have focused on the last sentence of this passage. *See, e.g., Imperial Distributors, Inc. v. United States,* 617 F.2d 892, 895 (1st Cir.), *cert. denied,* 449 U.S. 891, 101 S.Ct. 249, 66 L.Ed.2d 116 (1980); *United States v. One Residence and Attached Garage, etc.,* 603 F.2d 1231, 1238 (7th Cir.1979) (Wood, J., dissenting). This sentence appears to set forth a two-part test for appealability of Rule 41(e) motions. First, the motion must be "solely for return of property." Second, the motion cannot be "tied to a criminal prosecution *in esse* against the movant." The instant case presents a close question with respect to each of these requirements.

As Rule 41(e) is now written, no motion under that Rule could ever literally comply with the requirement that the motion be "solely for return of property." This is because under the Rule any motion for the return of property is automatically treated as a suppression motion as well. Once the property is ordered restored, the property becomes inadmissible as evidence in judicial proceedings. Accordingly, a number of courts have interpreted the word "solely" in the *DiBella* opinion as contemplating an inquiry into whether the "primary purpose" or "essential character" of the Rule 41(e) motion was to obtain the return of the items seized or to obtain a suppression order. *See Imperial Distributors, Inc. v. United States, supra,* 617 F.2d at 895; *United States v. Premises Known as 608 Taylor Ave.,* 584 F.2d 1297, 1300 (3d Cir.1978).

In the instant case, we believe Young's motion primarily sought the return of his documents. It is important to note that the federal agents took some sixteen boxes of his records pertaining to his business activities between 1976 and the date of the seizure. This involved a considerable interference with Young's ability to carry on his business affairs. The affidavit in support of his motion for return asserts that the sixteen boxes of seized files "are vital to the operation of his business" and "are needed on a

day by day basis."[3] Although he undoubtedly also wished to have the records suppressed, the main thrust of his motion was to obtain possession of the documents.

The second requirement of *DiBella*—that the motion not relate to an existing criminal prosecution—is less troublesome here. Although the documents were obtained from Young in connection with an ongoing grand jury investigation, no formal charges have yet been filed. In *DiBella* the Supreme Court suggested that the Rule 41(e) motion is deemed part of a criminal prosecution only if "at the time of ruling there is outstanding a complaint, or a detention or release on bail following arrest, or an arraignment, information, or indictment." 369 U.S. at 131, 82 S.Ct. at 660. *See also United States v. Ryan*, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971) ("review is available immediately of a denial of a motion for the return of seized property, where there is no criminal prosecution pending against the movant").

The circuits have divided on the specific question whether a Rule 41(e) motion is appealable when the moving party has not yet been charged or indicted. In a case decided thirteen years ago, this court held that a motion for relief under Fed.R.Crim.P. 41(e) was independent of any criminal prosecution *in esse*—and therefore appealable—where the moving party had neither been arrested nor arraigned. *United States v. Alexander*, 428 F.2d 1169, 1171 (8th Cir. 1970). More recently, the Seventh Circuit also has taken this position, holding that a Rule 41(e) motion becomes interlocutory only when criminal charges have been filed

against the appellant. *Mr. Lucky Messenger Service, Inc. v. United States*, 587 F.2d 15, 16 (7th Cir.1978) ("The motion for return of property is not one tied to a criminal prosecution in esse against the movant until the criminal process shifts from the investigatory phase to the accusatory."); *United States v. One Residence and Attached Garage, supra.* The Sixth and Tenth Circuits have also taken this view. *See, e.g., Coury v. United States*, 426 F.2d 1354 (6th Cir.1970); *Gottone v. United States*, 345 F.2d 165 (10th Cir.), *cert. denied*, 382 U.S. 901, 86 S.Ct. 234, 15 L.Ed.2d 155 (1965).[4] Under this analysis, although the investigation into Young's affairs commenced in 1981, because no charges of any kind have yet been filed against Young, we conclude that the second requirement of *DiBella* has been met. We therefore hold that because the primary purpose of the Rule 41(e) motion was for the return of the seized records and the motion was independent of any criminal prosecution—no arrest, indictment, or information having been made—the district court's order denying the motion is therefore appealable.

### III.

In response to the abuses of the English Crown during the seventeenth and eighteenth centuries in the arbitrary and capricious invasion of the homes of its citizenry, the Founding Fathers of our country paid special attention to avoiding such abuses by the central authority in their new nation. Their labors led to the adoption in 1791 of the fourth amendment which provides:

---

**3.** Young's motion strongly contrasts with *Imperial Distributors, Inc. v. United States, supra*, holding that the primary purpose of petitioners' Rule 41(e) motion was suppression where the movants never argued that they needed the property seized or that irreparable harm would result from the failure to return it, *see* 617 F.2d at 896, and did not respond to the Government's offer to make copies of the business records available to them.

**4.** A number of circuits, however, have interpreted the reference in *DiBella* to a "criminal prosecution *in esse*" as including pending grand jury proceedings, even when no formal charge has yet been filed. *See, e.g., Standard*

*Drywall, Inc. v. United States*, 668 F.2d 156 (2d Cir.), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982); *In re Grand Jury Proceedings*, 604 F.2d 806 (3d Cir.1979) (per curiam); *Simons v. United States*, 592 F.2d 251 (5th Cir.) (per curiam), *cert. denied*, 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 45 (1979); *Church of Scientology of California v. United States*, 591 F.2d 533 (9th Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 729 (1980). *See also Imperial Distributors, Inc. v. United States, supra*, 617 F.2d at 896. We reject this interpretation of a "criminal prosecution *in esse*."

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The amendment consists of two separate clauses, both of which are implicated in this case.[5]  First, Young contends that the search of his office was so broad as to violate the first clause of the amendment, which prohibits "unreasonable" searches and seizures.  Second, he claims that the Government failed to comply with the warrant clause of the amendment because the supporting affidavit was insufficient to establish the existence of probable cause.

█ Plaintiff's argument that the search warrant authorized an improper general "exploratory" search of his office has considerable merit on the facts of this case.  The warrant authorized the FBI to seize all records pertaining to his bail bonding business for the period January 1, 1976, to the present.  The scope of the search was otherwise unlimited: the warrant did not indicate that the documents sought pertained to any specific transactions, did not identify the offenses on which evidence was sought, and did not confine the search to any particular files or categories of documents.  In the absence of any clearly demonstrated

necessity, the seven-year period covered by the search warrant is excessive and unreasonable.  Indeed, it is difficult to imagine a search warrant stated in more general terms.[6]

The Supreme Court made clear in *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976):

General warrants, of course, are prohibited by the Fourth Amendment. "[T]he problem [posed by the general warrant] is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings. . . .  [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire,* 403 U.S. 443, 467 [91 S.Ct. 2022, 2038, 29 L.Ed.2d 564] (1971).  This requirement " 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford v. Texas,* 379 U.S. 476, 485 [85 S.Ct. 506, 512, 13 L.Ed.2d 431] (1965), quoting *Marron v. United States,* [275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)].

This language is highly applicable to this case.  There is much force to Young's contention that the search warrant authorized the FBI to go into his office and rummage

---

**5.**  Justice Jackson assessed the rights protected by the fourth amendment as "not mere second-class rights but [those that] belong in the catalog of indispensable freedoms. . . .  Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar v. United States,* 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting).

**6.**  The search warrant, listing a large number of records likely to be kept by any bail bonding business, authorized the seizure of all individual client files without limitation and all "bail bond records for the period from January 1, 1976, to the present including:
   Copies of Minnesota Trust Company and First Heartland Surety & Casualty Insurance Company bail bonds or powers of attorney.  Applications for bonding from defendants.  Records showing payments received from or

made to defendants.  Individual files of each defendant, subject or client.  Bonding Company accounts receivable and accounts payable records including accounts receivable book.  Sub-agent's files concerning bail bonds.  Cancelled checks, deposit tickets and monthly statements from the Bob Young Bonding Company Checking Account No. 20–968 maintained at the First National Bank of Moorhead, Moorhead, Minnesota.  Bail bond reports submitted to First Heartland Surety & Casualty Insurance Company and Minnesota Trust Company by Bob Young Agency and bail bond reports submitted to the Young Agency by sub-agents.  Records of bail bond income and expenses, bail bond defaults, bail bond premium schedules of any bail bond surety company and contracts with any bail bond surety company."

through all his business files seeking any information pertaining to any federal crime, or at least any information pertaining to the generic crime of interstate fraud that was under investigation. Thus the warrant created the very risk of excessive intrusions by law enforcement authorities into private affairs that the fourth amendment was intended to guard against. The warrant did not confine the search to documents relating to fraud in charges, collections, and reporting of specific bail bond premiums, but authorized the seizure of all documents in Young's bail bond operations without any enumeration or specificity. *See United States v. Roche,* 614 F.2d 6, 7 (1st Cir.1980).

The Government makes several arguments in defense of its search. First, it claims that the search warrant "described with particularity the items to be seized and left nothing to the discretion of the officer executing the warrant." The Government emphasizes that the warrant contained a lengthy list of the types of records that could be seized (e.g., copies of bail bonds or powers of attorney, applications for bonding, payment records, individual files of each defendant, subject, or client, etc.). It asserts that this list provides sufficient specificity to limit the scope of the search. The district court evidently was persuaded by this argument, noting that "[t]he warrant specifically listed the records sought, which records may be evidence of such criminal activity."

For several reasons we believe that this laundry list of various type of records is insufficient to save the search warrant. In the first place, the FBI was not restricted to the items on the list. Its primary authority was generally to seize "bail bond records for the period from January 1, 1976, to the present . . . ." Second, the list itself was overly broad, consisting of little more

than a broad statement of the types of records ordinarily kept by any bail bondsman. There were no designations or references to particular transactions or to specific individuals or specific files, or to a reasonably specific time within the approximately seven-year period. Indeed, the list did not even refer to the type of criminal offense. Although the Supreme Court in *Andresen v. Maryland, supra,* suggested that a list of document types satisfies the particularity requirement when the warrant expressly relates the documents to a single transaction under investigation, the warrant in this case contained no such limitation.[7] Unlike *Andresen,* we have no fixed or specific transaction to which any of the documents sought in the instant case can be related.

The Government also suggests that the scope of the warrant was reasonable in view of the complexity of the criminal schemes of which Young was suspected.[8] It cites a footnote from the Supreme Court's opinion in *Andresen v. Maryland, supra,* stating that "[t]he complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession." 427 U.S. at 481 n. 10, 96 S.Ct. at 2749 n. 10. This quotation does not help the Government here. In *Andresen,* the prosecutors had established probable cause to believe that the defendant was engaged in a fraudulent scheme with respect to a particular parcel of real estate. As noted above, the list of documents to be seized all pertained to that particular parcel. In the instant case, assuming the Government has established probable cause at all, the most that it has even arguably established is probable cause to believe that Young defrauded the two surety companies

---

7. In *Andresen,* the warrant contained a lengthy list of specified items to be seized, all limited by the preceding phrase "the following items pertaining to sale, purchase, settlement and conveyance of Lot 13, block T, Potomac Woods subdivision." *See* 427 U.S. at 480 n. 10, 96 S.Ct. at 2748 n. 10.

8. The district court saw merit in this argument, observing that "[t]he affidavit in support of the warrant alleges a somewhat complex and continued type of criminal activity which may have spanned a term of several years."

he represented in several transactions. The warrant, however, was not limited at all in its scope. Neither *Andresen* nor any other case supports the basic proposition on which the Government's position depends—that where complex criminal activity is suspected, the scope of a search warrant is not limited by probable cause.

As for the Government's argument that the search warrant in the instant case left nothing to the discretion of the officers, this is true only in the most perverse sense. Because the warrant authorized a seizure of all bail bond records over a period of almost seven years, the agents had no discretion to exercise. Obviously, this does not demonstrate the constitutionality of the search. Similarly, the Government's attempt to justify the scope of the warrant by pointing out that the "inventory of property seized closely corresponds to the descriptions of the warrant" has little relevance. Where the warrant allows a seizure of everything, the items seized necessarily will correspond to the scope of the warrant. The crucial question is whether the warrant authorized too much under the law.

Finally, the Government suggests that this case presents no constitutional problem because it did not rummage in a *person's* belongings; rather, the records of a company were searched. Since the Young Bonding Company was not incorporated, the records were really Young's personal records. Moreover, there is neither authority nor reason to support the Government's position that a less exacting standard of constitutionality applies to the search of business records. *See United States v. Roche, supra,* 614 F.2d at 7 n. 2.

The property authorized for seizure in the instant case parallels in its description the records authorized for seizure in *United States v. Roche, supra.* The warrant in that case contained a list of the items to be seized, i.e., "books, records, documents, consisting of but not limited to insurance appli- cations, premium notices, claims requests for recovery, correspondence relating to applications and claims, policies, ledger sheets ... which are evidence, fruits, and instrumentalities of the violation of [18 U.S.C. § 1341]." The court held that this was an overly broad warrant because it went well beyond the foundation of probable cause: the warrant authorized a seizure of a broad class of documents when the Government had probable cause only to search for evidence of fraud in connection with automobile insurance. *Id.* at 7. The court held that the reference to violations of 18 U.S.C. § 1341 provided "no limitation at all" since the statute was itself extremely broad in scope (the statute prohibited all frauds that utilize the mails). In the instant case, the warrant did not even include a reference to this statute or to the other statutes that Young was suspected of violating.[9] *See also United States v. Cardwell,* 680 F.2d 75 (9th Cir.1982); *United States v. Abrams,* 615 F.2d 541, 542–43 (1st Cir.1980); *Pieper v. United States,* 604 F.2d 1131, 1134 (8th Cir.1979); *VonderAhe v. Howland,* 508 F.2d 364, 370–71 (9th Cir.1974).

The cases cited by the Government are distinguishable from the instant case. *See United States v. Coppage,* 635 F.2d 683, 686–87 (8th Cir.1980); *United States v. Dennis,* 625 F.2d 782, 792 (8th Cir.1980); *United States v. Muckenthaler,* 584 F.2d 240, 245 (8th Cir.1978). In each of these cases there was at least some specificity to the warrant. In the instant case, the warrant did not relate the documents sought to any particular offense, individual transaction, or even to a specific provision of the U.S. Code. We therefore hold that the search warrant, having no particularity in its description of the records to be searched and seized, constituted a general warrant violating the fourth amendment.

## IV.

■ Young also contends that, independent of the breadth of the search, the war-

---

**9.** The *Roche* court noted that when an affidavit in support of a search warrant contains a detailed list of evidence sought, the affidavit may be incorporated into the warrant to provide the necessary specificity. But in neither *Roche* nor the instant case did the magistrate so incorporate the affidavit into the warrant.

rant was defective because the underlying affidavit of FBI Agent Frost did not satisfy the requirements of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).[10] The district court did not have the benefit of *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), decided approximately six months after the district court's decision in this case, in which the Supreme Court abandoned the "two-pronged test" of *Aguilar* and *Spinelli* for determining whether an informant's tip establishes probable cause. The Court was concerned that this test, as it had evolved since its first enunciation, had impractically led to a rigid analysis based on "two largely independent channels"—the informant's veracity and his basis of knowledge—thereby "seriously impeding the task of law enforcement." *Id.* at ——, ——, 103 S.Ct. at 2328, 2330. The Court therefore substituted for the "two-pronged" test what it described as a "totality of the circumstances" analysis under which "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*Id.* —— U.S. at ——, 103 S.Ct. at 2332. Under this flexible standard, the Court explained that the duty of a reviewing court is merely to determine that the magistrate had a substantial basis for concluding that probable cause existed.

The district court in the instant case held that the affidavit adequately supported the magistrate's finding of probable cause for the following reasons:

> An inference arises from the information provided to the magistrate that there was probable cause to believe Robert E. Young may have collected premiums on bail bonds and later voided the bonds without returning the premiums to defendants-clients, or reporting the collection to the bond surety companies. The finding of probable cause is further supported by the allegations of the home improvement loan and civil litigation incidents.

We disagree. The affidavit of FBI agent Frost is largely a broad, boilerplate statement describing in a general way the applications, reports, and records that are commonly kept by any typical bail bond operation.[11] The affidavit vaguely asserts that Young was associated with a number of bonds that had been voided without explanation, but sets forth no basis whatsoever for suspecting that the voiding of bonds was illegal or improper.[12] Agent Frost re-

---

**10.** In *Aguilar* and *Spinelli,* the Supreme Court set forth two requirements for affidavits containing information provided by unidentified informants. First, the application for the warrant must set forth enough of the "underlying circumstances necessary to enable the magistrate independently to judge the validity of the informant's conclusion" reported in the warrant. Second, the affiant must establish that the informant was credible or his information reliable. *See Spinelli, supra,* 393 U.S. at 413, 89 S.Ct. at 587; *Aguilar, supra,* 378 U.S. at 114, 84 S.Ct. at 1513. The appellant claims that since the determination of probable cause in this case depended on the information provided to the police by informants, and because the affidavit did not set forth any basis for the magistrate to evaluate the informants' statements, the warrant is invalid.

**11.** The affidavit asserted that bail bond records from January 1, 1976, to date were being stored

at Young's place of business, including applications for bonding from defendants, records of their payments, bonding company accounts receivable and payable, sub-agent files, Young's cancelled checks, deposit tickets, and monthly bank statements, bail bond reports to the two companies represented by Young, records of bail bond income and expenses, bail bond defaults, and bail bond contracts and premium schedules.

**12.** If the bonds had been improperly voided, the surety companies that Young represented would have had an interest in compelling Young to account for the funds. It is significant that the surety companies have taken no action against Young. In addition, one cannot help but wonder why the Government was not able to get adequate information about the voided bonds from the surety companies themselves, thereby obviating the need for a search and seizure of Young's records.

fers to a "lack of clarity in the Bob Young Agency activities." The only effort to provide specificity is a reference to three items of information Agent Frost had learned from interviews.

First, the affidavit stated that a "confidential source, who has in the past provided reliable information regarding at least seven matters, stated that on one occasion after Bob Young had received approximately $500 in cash, ... Young was quoted as having said 'This doesn't have to be reported.'" Although the affidavit set forth a basis for believing that the informant was reliable and credible, it did not give any of the underlying circumstances from which the source concluded that Young actually made the statement attributed to him. It does not state to whom Young made the statement, when, or under what circumstances. Evidently, the informant was not himself present at the time Young made this statement; the informant was merely conveying to the FBI what Young was quoted as having said. The affidavit fails to set forth any reason for believing this hearsay. Applying the totality of the circumstances test of *Illinois v. Gates, supra,* it is apparent that the affidavit does not establish the reliability of the hearsay information. Moreover, even if the hearsay is true and Young did actually make the statement, the affidavit gives no reason to believe that there was anything dishonest or improper in Young's remark. It may well be that the cash did not have to be reported, just as Young allegedly said. Thus the remark reported in the affidavit does not provide "a substantial basis for determining the existence of probable cause." At ——, 103 S.Ct. at 2332.

The second specific incident described by the affidavit, predicated on an amorphous "investigation," is Young's alleged use of "intimidating and threatening tactics" in

violation of 18 U.S.C. § 891 to collect an additional premium from a client who had already paid Young $500 in cash plus "a ring and watch valued at $900 and a bill of sale for a $1000 cash register." The affidavit alleges that Young posted the bond with the court for an unnamed client in connection with unidentified civil litigation. There is no indication how the FBI came upon this information, i.e., whether by hearsay or directly from the victim. Furthermore, the affidavit did not provide sufficient detail for the magistrate to evaluate the assertions: the affidavit should have described the nature of the alleged intimidating tactics and provided some detail as to the circumstances, some identification of the victim, and some corroboration that the property had in fact been turned over to the appellant.

The affidavit also contains vague statements concerning an alleged incident of misconduct by Young in December 1978, involving an individual who paid a bail bond premium with the proceeds of a home improvement loan. The affidavit states, "It is believed that Bob Young may have participated in drawing up the application for said ... loan," which application contained false information to a federally insured financial institution, in violation of 18 U.S.C. § 1014. Obviously, in the absence of any basis for this belief (and none was given), the statement appears to be pure speculation that cannot satisfy the requirements of the Constitution. Moreover, there is no suggestion of the nature of the false information and whether Young knew it was false and knowingly participated in furnishing it.

The specific incidents relied on have neither the substance nor the detail required to give the issuing magistrate a substantial basis for concluding that probable cause[13] existed. In explaining that even under its

---

13. The probable cause standard applied by the courts historically seeks to safeguard citizens from reckless and unreasonable invasions of their privacy and also gives "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1948). "Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Id.* at 175–76, 69 S.Ct. at 1310–11 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)).

new, flexible, and more easily applied standard there are nonetheless "limits beyond which a magistrate may not venture in issuing a warrant," at ——, 103 S.Ct. at 2332, the Court in *Illinois v. Gates* admonished,

> Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.

*Id.*

The Government complains that Young is attacking the adequacy of the affidavit through a "piecemeal approach." According to the Government, "although each allegation in the affidavit, standing alone, may not be sufficient in the instant case, we believe that the coalescence of all these factual allegations leads to the inescapable conclusion that there was a sound basis to believe that probable cause existed to issue the warrant to search Young's office and seize bail bond records." It is true that a determination of probable cause depends on a reading of the affidavit as a whole. *Illinois v. Gates, supra,* —— U.S. at ——, 103 S.Ct. at 2332. But in the instant case the affidavit as a whole consists of nothing more than a stringing together of what appear to be vague and unsupported rumors, suspicions, and bare conclusions of others.[14]

We therefore hold that in the affidavit before him, the issuing magistrate did not have sufficient information to find probable cause to search the premises of the appellant and to seize the records of Young's bail-bonding business.

---

**14.** The Government also attempts to relieve itself of the duty to supply sufficient information to establish probable cause by suggesting that the information contained in the warrant was obtained not from informants, but from persons who were interviewed by the FBI as part of its investigation. We see no substance to this purported distinction. It is true that

## V.

To recapitulate, the order of the district court rejecting appellant's motion pursuant to Fed.R.Crim.P. 41(e) is appealable. The warrant authorizing the search and seizure was exploratory, overly broad, and therefore constitutionally defective. Moreover, the supporting affidavit for the search warrant did not comply with the standards enunciated by the Supreme Court in *Illinois v. Gates, supra;* it did not provide the issuing magistrate with a substantial basis to determine the presence of probable cause for the search and seizure.

Accordingly, the judgment of the district court is reversed and the cause is remanded with directions to grant appellant's motion under Fed.R.Crim.P. 41(e) for the return of his property.

FLOYD R. GIBSON, Senior Circuit Judge, concurring in the result.

I agree in the majority's holding that Young's Rule 41(e) motion was appealable because it primarily sought the return of documents and was not tied to an existing criminal prosecution. I further agree that the search warrant was an improper general warrant, authorizing a boundless exploratory search. Thus, I would concur in the result reached by the majority, reversing the judgment of the district court. However, I am compelled to write separately because I disagree with the majority's holding that Agent Frost's affidavit did not give the magistrate sufficient information from which to find, based upon the "totality of the circumstances," that probable cause existed. The affidavit provided the magistrate a substantial basis for concluding that a search of Young's bonding company records would uncover evidence of wrongdoing.

The affidavit here was not based upon information received from paid informants,

statements of paid informants are viewed with particular skepticism by courts. The important point, however, is that the affidavit provided no basis for the magistrate to evaluate either the credibility of the sources of this information (whoever these sources were) or the reasonableness of the conclusions these sources drew from the information.

whose credibility is naturally suspect, but from records obtained from the two surety companies through whom Young purportedly acted and from persons interviewed during the course of an FBI investigation. Those interviewed and relied upon included persons who had used Bob Young as their bonding agent and who were victims of the alleged crimes. As noted in *United States v. Singer,* 687 F.2d 1135, at 1145 n. 19 (8th Cir.1982): "When the source of information is an ordinary cooperative citizen, the proof-of-veracity rules which obtain informant cases are inapplicable, and the information received is presumed reliable. While an 'informer' usually expects gain or concession in exchange for information, the ordinary citizen who reports a crime does so because of his concern for society." And, similarly, when the source is a victim of the crime, his reliability need not be shown by other facts. *United States v. Mahler,* 442 F.2d 1172, 1174 (9th Cir.1971), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971). The distinction between a paid informant and those sources relied upon here is also important in determining the extent of detail required to establish the basis of the source's knowledge. As stated in *Illinois v. Gates,* —— U.S. ——, ——, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527, 545 (1983), "if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of knowledge unnecessary."

Considering the foregoing, I would initially regard as reliable the confidential information that Bob Young received approximately $500.00 in cash and was quoted as having said, "This doesn't have to be reported." While conceding that the source of this information was reliable and credible, the majority concludes that there was not a sufficient underlying factual basis given to establish the reliability of this information. In doing so, I believe the majority applies a too-rigid compartmentalization of concepts of "reliability" and "basis of knowledge." In *Gates,* at ——, 103 S.Ct. at 2329, 76 L.Ed.2d at 545, the court emphasized that under the "totality of circumstances" ap-

proach for determining whether a tip establishes probable cause, a deficiency in the basis of knowledge for a tip may be compensated by a stronger showing of the informant's reliability. *Id.* For example, if, as in this case, an informant has proven to be an unusually reliable informant in the past, "his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip." *Id.*

Furthermore, although the information here was hearsay, it "is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented." *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). The information here was received from an extremely reliable source and was consistent with the records obtained from the surety companies indicating various bail bonds had been voided without explanation. (Affidavit at pp. 2–3).

I would refrain from speculating, as the majority does (See majority opinion at 500, note 12), that the surety companies' purported failure to take action against Young indicates that Young could not have been involved in any improper use of the voided bonds. The record does not clearly indicate that the surety companies have failed to pursue the matter. In any event, their purported failure to take action may be attributable to any of a host of reasons, wholly apart from whether they believed Young had done anything improper.

Nor can I agree with the majority that the affidavit gave no reason to believe that there was anything improper about Young's remark. We must look at the remark in the context of the overall picture. As the affidavit indicates, Young was being investigated for his alleged failure to disclose to the surety companies that he had received cash premiums from various defendants on voided bonds. Pursuant to this investigation, the surety companies' records were obtained, revealing that various voided bonds were inadequately explained by Young. The unquestionably reliable source who quoted Young's remark was presumably providing information relevant to this

investigation. Considered in this context, I believe one could certainly entertain a reason to believe that the remark was made in reference to Young's suspected criminal activity, particularly since the remark referred to the nonreporting of a cash collection. While it would have been preferable for the affidavit to expressly state that Young's quoted remark was made in reference to the receipt of cash premiums on voided bonds, I do not believe the deficiency here negates a finding of probable cause. Affidavits are to be interpreted in a common sense, nontechnical manner, with an emphasis on probabilities in particular factual contexts, not hard certainties. *Gates,* —— U.S. at ——, 103 S.Ct. at 2328, 76 L.Ed.2d at 544.

Similarly, the majority applies a too rigid standard in determining whether the affidavit provided sufficient detail as to Young's alleged use of intimidating and threatening tactics to collect additional premiums from clients. The information regarding this allegation obviously came from a victim of the alleged crime, whose reliability need not be shown by other facts. *See Mahler,* 442 F.2d at 1174. The affidavit identifies the victim as having been involved in civil litigation regarding his landlord in which he was required to post a $750.00 bond with the court. Young was reported to have posted the $750.00 bond and charged the victim-client with "$500.00 cash, a ring and a watch valued at $900.00, plus a bill of sale for a $1,000.00 cash register." The affidavit then states: "Young kept the collateral and sent his client a bill for an additional $650.00. When the client failed to make payment, Young used intimidating and threatening tactics to collect the funds...." Thus, the affidavit tells us that while Young retained $2,400.00 in cash and merchandise in return for posting a $750.00 bond, he still sought an additional $650.00 from the victim-client, using threatening and intimidating tactics. Under these circumstances I do not believe it was fatal that the affidavit failed to detail the nature of the threats or intimidation. Furthermore, given the "barter-like" nature of the transaction between the victim and Young, it would have been extremely diffi-

cult to supply corroboration that the property had in fact been turned over to Young. The corroboration for the victim's claims would best be supplied by a search of Young's records.

In sum, I conclude that the magistrate gave a common sense interpretation to all of the circumstances set forth in the affidavit, and reasonably concluded that there was a fair probability that evidence of a crime would be found from the search of Young's bail-bonding records.