**UNITED STATES of America, Plaintiff,**

**v.**

**ONE 1967 CESSNA AIRCRAFT, SERIAL NO. P206–0318, REGISTRATION NO. N4718F, ITS TOOLS AND APPURTENANCES, Defendant,**

**Stephen Daniel Fischer, Claimant.**

**No. CV76–3152–RMT.**

United States District Court,
C. D. California.

July 31, 1978.

Andrea Sheridan Ordin, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., Peter M. Kane, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Chester B. Sloane, Rosana M. Selesnick, Los Angeles, Cal., for claimant.

## MEMORANDUM

TAKASUGI, District Judge.

### FACTS

Plaintiff, United States of America, filed a Complaint for Forfeiture of one 1967 Cessna Aircraft under the provisions of 19 U.S.C. § 1595a(a)[1] and 21 U.S.C. § 881[2] providing for seizure and forfeiture. Stephen Daniel Fischer (herein Fischer) as claimant filed an Answer alleging ownership. He then filed this motion to dismiss for lack of admissible evidence. The basis of this motion is essentially a claimed violation of the Fourth Amendment.

A brief summary of the salient facts is essential for an analysis of the case.

On August 27, 1975, Fischer contacted Edwin C. Remund (herein Remund) in order to negotiate a purchase of the latter's aircraft. Arrangements were made to meet on August 29, 1975 to permit Fischer to inspect the plane and finalize the purchase.

On August 29, 1975, agents of the United States Customs (herein Customs) contacted Remund and were advised of Fischer's communication relative to the aircraft in question. Although Customs was desirous of installing a transponder in the plane at that time and, according to the plaintiff, secured Remund's consent thereto, there was insufficient time to install the device because of the Fischer-Remund appointment scheduled on that date. On the issue of consent, Fischer contends that Remund's consent was vitiated by his antagonistic state of mind. Although there is a substantial dispute as to the facts surrounding Remund's consent, there is no dispute that Customs did insert in the written consent statement, prepared by Customs and signed by Remund, that upon the seizure of the aircraft, the seizure would be processed under the provisions of constructive seizure and returned to Remund in "the most expeditious manner possible." This statement by Customs was inserted even though they were fully aware of the Remund-Fischer transaction as above described.

A few hours later, Remund and Fischer met and, after the craft was inspected by Fischer, a purchase agreement was formed. Fischer then paid almost one-half of the purchase price and agreed to pay the balance on September 2, 1975.[3] Remund re-

---

1. 19 U.S.C. § 1595a reads, in pertinent part: "(a) . . . every . . . aircraft . . used in . . . the importation, bringing in, unlading, landing, removal, concealing, harboring . . . of any article which is being or has been introduced, or attempted to be introduced, into the United States contrary to law . . . shall be seized and forfeited together with its tackle, apparel, furniture, harness, or equipment."

2. 21 U.S.C. § 881 sets forth property subject to forfeiture, disposition of forfeited property, as well as other regulations dealing with seized property.

3. In the Remund-Fischer telephone conversation of August 27, 1975, the parties agreed that when they met on August 29, 1975, Fischer would turn over to Remund the full payment for defendant airplane in cash and cashier's check. On August 29, Fischer was prepared to tender the full price, fully expecting to consummate the purchase at this point. Remund refused to accept certain cashier's checks which he could not immediately cash at the bank they first went to. The cashier's checks were drawn on more than one bank. It would seem that Remund delayed the final consummation of the sale by refusing to accept certain cashier's

tained the keys to and the possession of the plane with the understanding that upon full payment Remund would transfer possession of it to Fischer.

Thereafter a transponder was installed by Customs.

On September 2, 1975, Fischer paid the balance of the purchase price and, pursuant to Fischer's request, the title thereto was placed in the name of Betty Allen, Fischer's mother.

Following the use of the aircraft by Fischer, Customs searched the aircraft and found three flakes of marijuana therein. The plane was then seized from Fischer's possession. Subsequent to this seizure, Betty Allen for the first time learned that Fischer had placed legal ownership of the aircraft in her name.

At no time did Customs seek or secure a warrant to justify the transponder installation or the search which uncovered the marijuana. The three flakes of marijuana were destroyed in the process of its analysis. The analysis, however, did establish that the substance was in fact marijuana. No criminal prosecution has been brought.

## DISCUSSION

### Is There a Fourth Amendment Issue?

 Under the facts of this case, there are at least three distinct transactions which must be reviewed, to wit, the act of installing the transponder, the subsequent surveillance of the aircraft based upon the electronic impulses emanating from the device, and the subsequent search of the plane. These distinctions were recognized in *United States v. Pretzinger*, 542 F.2d 517 (9th Cir. 1976), where the court stated that "no warrant is needed to justify installation of an electronic beeper unless fourth amendment rights necessarily would have to be violated in order to install the device." *Id.* at 520. There appears to be no dispute that the place of installation of the transponder and the subsequent search of the interior area of the aircraft were areas calling for a reasonable expectation of privacy.

As to the subsequent surveillance of the plane following the installation of transponder, the court in *United States v. Hufford*, 539 F.2d at 32 (9th Cir. 1976), *cert. denied* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976), declared that there was no reasonable expectation of privacy where one knowingly exposes his presence and location to public view. *But see United States v. Holmes*, 521 F.2d 859 (5th Cir. 1975), *aff'd en banc*, 537 F.2d 227 (5th Cir. 1976).

We therefore conclude that a Fourth Amendment issue does exist as to the initial installation of the transponder (*Pretzinger*) as well as to the later interior search of the plane.[4]

checks despite a prior agreement to accept them, so as to hopefully bolster his position to consent to the installation of the transponder.

4. In *Hufford, supra*, a defendant paid a deposit on two large drums of caffeine, a chemical used in the manufacture of amphetamines. After this payment, but prior to full payment or delivery, agents, with the consent of the company which still had title and control over the drums, installed electronic tracking devices in the drums. The validity of the consent was not in issue.

This court is aware that the *Hufford* court stated:

"While the drums remained in the possession of the chemical company, the defendants did not have any control over their movements, and therefore did not have any reasonable expectation of privacy under the Fourth Amendment concerning the drums." 539 F.2d at 34.

However, in the very next sentence the *Hufford* court required the chemical company's (valid) consent before the agents could attach the beeper. *Hufford* raised no problem as to defendant's standing. Ninth Circuit cases after *Hufford* inquire into whether a Fourth Amendment violation occurred at the time of the installation of the transponder. *Pretzinger, supra*; *United States v. Curtis*, 562 F.2d 1153 (9th Cir. 1977); *United States v. Miroyan*, 577 F.2d 489 (9th Cir. 1978). No standing problems were found for defendants in these later cases either, including the two pre-rental cases *Curtis* and *Miroyan*.

In *Miroyan*, after explicitly finding that the plane (prior to the commencement of the actual rental period) was within the owner's "complete dominion," the court still required the (valid) consent of the owner before holding that

### Is the Failure to Secure A Warrant Excused by Consent?

█ Both plaintiff and claimant devote considerable time and energy to the facts surrounding Remund's consent. Fischer contends that Remund's state of mind was antagonistic to him in that Remund's consent was motivated by a cunning scheme to eventually have not only the full purchase price of the plane but also the plane itself. In *United States v. Mazurkiewicz*, 431 F.2d 839 (3rd Cir. 1970), the court, by way of *dictum*, indicated the emergence of the concept of antagonistic hostility toward another as vitiating the consent given by the harborer of such a state of mind. *Mazurkiewicz*, however, dealt with a husband and wife relationship with consent arising from an institution of trust with each having an equal right to possession or control. In the case at bar, Fischer had no such right at the time of the installation of the transponder. Additionally, the keys were retained by Remund. Unlike *Mazurkiewicz*, the antagonism harbored by Remund was pecuniary and the hostility impersonal. The claimant's reliance upon *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) and *United States v. Diggs*, 544

F.2d 116 (3rd Cir. 1976) to further the *Mazurkiewicz* concept of antagonistic hostility is misplaced.[5]

█ Although the claimant did not articulate the argument, the reverse side of the analysis of Remund's state of mind is an inquiry into Customs' conduct in securing this consent. This analysis is advanced by the major reasons underlying the exclusionary rule, to wit, to deter police misconduct relative to unlawful search and seizure and to uphold the integrity of the judicial system. Plaintiff concedes that Customs was fully aware of the August 25 and August 29 transactions between Remund and Fischer. The installation of the electronic device would have its intended utility *only* if the Remund-Fischer agreement was fully executed, *i. e.*, if Fischer had paid the full purchase price and obtained possession of the aircraft. At this point, Remund would not have any interest, possessory or proprietary, in relation to the aircraft nor would he have any right of control. In essence, Remund was asked to consent to the installation of a device which has a utility only if, by the terms of the Remund-Fischer agreement, Remund had no remaining interest in the object upon which the device is installed—a fact well known to Customs.

---

no violation of defendants' Fourth Amendment rights occurred. The *Miroyan* court concluded: "We therefore hold that the installation of the transponder, performed with the consent of the aircraft's owner and while the plane was within his dominion, did not violate the fourth amendment rights of Miroyan or McGinnis." *Id.* at 493.
Thus, according to this circuit's most recent discussions of this situation, as well as perhaps in *Hufford* itself, the Fourth Amendment inquiry does not end with a finding, in a pre-rental or pre-sale circumstance, that the item to which a transponder was attached was in the complete control of the owner of the item at the time of the transponder's installation. *Hufford*'s statement that no reasonable expectation of privacy existed at the time of the installation would end the inquiry because in *Hufford, Curtis* and *Miroyan*, the party before the court (the buyer or renter) would have had no standing to object to any illegality in the installation. However, in each of these cases the Ninth Circuit held that the installation must be valid (valid consent or warrant).

5. In *Matlock* the Supreme Court discussed hostility and bias against respondent not as a factor to consider re consent, but rather as going

to the reliability of statements made. 415 U.S. at 176, 94 S.Ct. 988.

In *Diggs*, defendant gave his common-law-wife's uncle a box to hold for him, but did not give him the key to it. Upon the uncle's learning that defendant had just been arrested for bank robbery, he contacted the F.B.I. The F.B.I. agents, with the uncle's consent, opened the box, using their own special keys. They then slid the unopened box to the uncle who thereafter opened it finding the stolen money inside. The Third Circuit upheld the warrantless search citing specifically the facts that the F.B.I.'s participation was far from the ordinary planned government search and that the uncle was innocent, but compromised. Claimant, in the case at bar, draws this court's attention to the Third Circuit's concern for the uncle's innocence, and compares that to Remund's alleged lack of innocence. But, as in *Mazurkiewicz*, the facts in *Diggs* are distinguishable from the case at bar especially on the differing relations and expectations of the parties involved—family ties with the attendant trust involved are different from business relations with the accompanying profit motives and expectations.

appears at top right.

Customs was aware that Remund had no legal or reasonable expectation of retaining both the money *and* the plane. Under that situation, Customs represented to Remund that the aircraft when seized would be returned to *him* in "the most expeditious manner possible."

We therefore conclude that the consent secured from Remund was vitiated by fraud and/or subterfuge.[6]

*Does Claimant Have "Standing" to Attack the Installation of the Transponder and Subsequent Search of the Aircraft?*

Although the problem could have been a viable issue in *Hufford, supra,* the "standing" issue was not specifically raised. The analysis of "standing" needs specific discussion.

We are called upon to decide the issue of "standing" as it pertains to two separate transactions. Under the facts of this case, however, a resolution of the "standing" issue pertaining to the *Pretzinger* issue will not inevitably mandate the same consistent conclusion as to the subsequent search.

■ To challenge the validity of the subsequent search of the aircraft, during which the contraband was discovered, Fischer must either have been: (1) present at the time of the search; *or* (2) the owner of the aircraft; *or* (3) charged with possession of the evidence seized. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Pretzinger, supra.* Fisher was present in the aircraft at the time it was held for a search by Customs. Some question does arise as to whether Fischer's physical possession of the aircraft is a recognized legal possession. The twist herein is whether the placing of Betty Allen's name as the registered and legal owner constituted a gift from Fischer to his mother. To effectuate a gift there must be present intent to confer a gift, a constructive or symbolic delivery and an acceptance. Delivery and acceptance did not occur here. Fischer clearly meets the first *Jones* test and probably the second. He was clearly the target of the search under *Jones.*

■ As to Fischer's standing to contest the installation of the transponder, Fischer had at the time of installation certain enforceable rights to the plane. He had tendered a portion of the purchase price. While Remund kept the key to the plane, this did not seem to be for the purpose of allowing Remund to use the plane, but rather for allowing him to hold the plane as possible security until Fischer paid the remainder of the price. These facts give Fischer enough interest in the plane to allow him standing. The question of standing should not rest on ancient, technical property relations, *Jones, supra,* 362 U.S. at 266, 80 S.Ct. 725, but instead on the essence of the relationship present. Fischer clearly was the target of the installation of the transponder. *Id.* at 261, 80 S.Ct. 725.[7]

We, therefore, recognize Fischer's standing to contest both the initial installation and the subsequent search.

**6.** In the case at bar, Remund knew exactly who the agents were and the extent of what their activities were to be. *Compare Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) and *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Likewise the agents did not have a concealed investigatory intent. *See Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921).

What we have here is a situation where agents, so as to circumvent a showing necessary for a warrant, have used a fraudulent representation as to the benefits to be gained by the consentor (who was not their target) in order to obtain "voluntary consent."

Non-targets consenting to acts aimed at others is already a complex area, fraught with poten-

tials for abuse and the possibility of undermining the delicate Fourth Amendment balance. To allow the form of consent by deception evidently used herein can only encourage serious actual abuse and undermine precious rights. No balancing consideration of law enforcement, such as has been found present with the need to use undercover agents, is present here.

**7.** In both *United States v. Curtis, supra,* and *United States v. Miroyan, supra,* the court, while not dealing with the issue specifically, raised no standing problem in a rental situation. Clearly if standing would be present in the pre-rental period, *a fortiori* it would be present under the facts of this case. *See footnote 4.*

## Was the Subsequent Search Valid?

The subsequent search of the aircraft which resulted in the discovery of the marijuana was made without either consent or a warrant.

■ Plaintiff contends, however, that the Bermuda Dunes Airport, where the search took place, was the functional equivalent of the border and, thus, the Customs agents would be permitted a full search without probable cause. However, under the facts before this court, the standards set for a "functional equivalent" have not been met. *United States v. Almeida-Sanchez*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Brennan*, 538 F.2d 711 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538, *reh. denied*, 430 U.S. 960, 97 S.Ct. 1611, 51 L.Ed.2d 812 (1977); *United States v. Ivey*, 546 F.2d 139 (5th Cir. 1977). Plaintiffs have not presented evidence, untainted by the use of the transponder, that they had a reasonable basis for believing, at the time of the search, that defendant aircraft was in flight, non-stop, from Mexico to Bermuda Dunes. Plaintiff's pointing to such an admission by claimant Fischer in a deposition taken subsequent to the search is inadequate to show knowledge by the Customs agents at the time of the search. *Ivey, supra*, 546 F.2d at 143. Additionally, Bermuda Dunes Airport, as was the case with Melbourne Regional Airport in *Brennan, supra*, 538 F.2d at 715, does not have the attributes of an airport which would be the functional equivalent of a border.

## Was There Probable Cause Under 19 U.S.C. § 1615?

The remaining question is whether after suppressing all of the evidence gathered as fruits of the illegal placement of the transponder in the aircraft, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States had sufficient information to at least show probable cause

to institute these forfeiture proceedings.[8] Under 19 U.S.C. § 1615, once the government has shown probable cause for the seizure of the aircraft, the burden is shifted to the claimant to prove such facts as are necessary to show that the property should not be forfeited. *United States v. One (1) 1972 Wood, 19 Ft. Custom Boat, FL8443AY*, 501 F.2d 1327 (5th Cir. 1974).

■ The government argues that such probable cause existed herein *prior* to the installation of the transponder and thus was not tainted by the illegality of such installation. The following is their argument:

"As early as September 23, 1974 Customs in Arizona had suspected the claimant of smuggling narcotics via rented aircraft.

"On July 22, 1975, at approximately 2:00 p. m., Officer Woods of the Riverside County Sheriff's Office received a phone (sic) from an anonymous female stating that Mr. Fischer and another individual were involved in the sale of heroin. On July 24, 1975, Mr. Fischer and another individual were arrested by Indio police for being under the influence of narcotics. Mr. Fischer was observed to have several puncture marks on his right arm, some as recent as one day old.

"At approximately 8:30 a. m. on July 25, 1975, Officer Woods received information from a confidential informant who stated that at 6:00 a. m. on the prior day Mr. Fischer had brought in a load of narcotics in a Cherokee 6 airplane, No. N4100R. The informant further stated that the narcotics consisted of ten kilos of heroin, one pound of cocaine and 400 pounds of marijuana. Subsequent to receiving this information, Officer Woods arrived at Bermuda Dunes Airport at approximately 9:30 a. m. on July 25, 1975, in an attempt to corroborate the data he had received. Upon his arrival he observed the airplane described by the informant tied down on the field. He

8. In this case the government must show probable cause to believe that *the aircraft* seized was used in the importation of proscribed drugs. 19 U.S.C. § 1595a(a). The government

must show a reasonable ground for belief of guilt. *United States v. (One) (1) Chevrolet Corvette Auto.*, 496 F.2d 210, 212 (5th Cir. 1974).

checked with the attendants at the airport and learned that the plane had arrived at Bermuda Dunes in the early morning hours of July 24, 1975; he further learned that the operator of the airplane purchased a tie-down space and gave the name Stephen Fischer.

"On August 13, 1975, Customs agents received information from a confidential informant that the defendant aircraft had departed from Palm Springs Airport on August 12, 1975, and had been flown by Mr. Fischer. The informant indicated that he suspected that Mr. Fischer was engaged in smuggling activities based upon the fact that he had purchased fuel on two occasions, 40 gallons and 20 gallons, and the payment was made in cash; further, Mr. Fischer, while at Palm Springs Airport, was very evasive when asked questions with respect to the aircraft and/or its destination. Based upon years of experience dealing with smugglers and smuggling operations, these foregoing observations, in the eyes of the government agents, fit the profile of a smuggler.

"On August 29, 1975, government agents received a telephone call from the owner of the defendant aircraft, Mr. Edwin C. Remund. Mr. Remund stated that on the date he had received a telephone call from an individual identifying himself as Stephen Fischer who advised him that he had previously rented the aircraft and that he was interested in purchasing it." Plaintiff's Reply Memorandum of Law Re: Certain Issues, at 6–8.

This information fails to rise to the level of probable cause. The court is not given the basis for Customs' suspicion "as early as September 23, 1974," and thus cannot evaluate it. The July 22, 1975, phone call was anonymous and unverified. While the court considers this as a factor in establishing probable cause, its impact is lessened because the outcome of the July 24, 1975, arrest is not revealed to the court and the arrest was for being "under the influence" and not for smuggling. The July 25, 1975, information from a confidential informant is the strongest information received by Customs. However, neither informant's past reliability, if any, nor whether the informant was an innocent citizen or one engaged in criminal activity is stated. Also, how the informant received this information is not divulged. While certain of the information was verified, such verification (as well as the informant's reliability) does not rise to the level found in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

As to the August 13, 1975, information, again the court is left adrift as to the reliability of the informant. The information was not verified. The content of Fischer's "evasive" answers is not divulged. Additionally, since the informant's relation to Fischer is not divulged, there is no way to determine if the so-called "evasive" answers would be natural or not. While it is stated that Fischer's alleged actions "fit the profile of a smuggler," it is difficult, without more, to find the purchase for cash of relatively small amounts of fuel and unspecified "evasive" answers as being the "profile of a smuggler" sufficient to meet a standard of probable cause. It is noted that this is the first tie-in to *defendant* aircraft.

Even taking all of the above together and viewing it in its entirety, probable cause just is not present. Suspicion, yes, but probable cause, no. The data provided are too soft, the holes too large. More is required.

Claimant's Motion to Dismiss is granted.