UNITED STATES of America, Appellee,

v.

Billy Gene LITTLE, Appellant.

UNITED STATES of America, Appellee,

v.

John Roger SAGER, Appellant.

UNITED STATES of America, Appellee,

v.

Jay Houston HARMON, Appellant.

Nos. 82–1591, 82–1592, 82–1593.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1984.

Decided May 22, 1984.

Rehearing Granted Sept. 27, 1984.

Daniel R. Carter, Atty. at Law, Little Rock, Ark., for appellant, Billy Gene Little.

George W. Proctor, U.S. Atty., Eastern Dist. of Ark. by Don N. Curdie, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before BRIGHT, McMILLIAN, and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

Defendants Billy Gene Little, John Roger Sager, and Jay Houston Harmon all appeal their convictions of conspiracy and drug charges. The pivotal questions are: (1) whether these defendants had a legitimate expectation of privacy in a Piper Navajo plane, enabling them to object to a court order authorizing the government to install a transponder on the plane, and, if so, (2) whether the affidavit on which the order was based was valid. We hold that John Sager and Jay Harmon had a legitimate expectation of privacy in the plane, and that Billy Little did not. In addition, we hold that the affidavit was invalid. The conviction of Little will be affirmed, but those of Sager and Harmon must be reversed.

## I.

In December 1980, Roy Fulbright and Frank Livesay wanted to buy a plane to transport drugs. Wayne Huntsman purchased a Piper Navajo plane, No. N6782–L, for Fulbright's and Livesay's use. Fulbright and Livesay agreed to lease the plane from Huntsman for an amount sufficient to cover Huntsman's monthly payments. Huntsman bought the plane from K.G. Coker of Coker Aircraft Sales. Huntsman told Coker that he was renting the plane out for $30,000, but no rental time period was stated.

From December 1980 to April 1981 Fulbright and Livesay used the plane to haul drugs. In late April or early May, Harmon, acting on behalf of Sager, contacted Fulbright, and negotiations began for a Jamaica trip to pick up 1500 pounds of marijuana. In early May, Fulbright agreed to go in late May to Jamaica to pick up the marijuana and return to the United States. Shortly after the agreement, Fulbright discussed using the plane in the interim to pick up drugs somewhere else. Sager made it clear that Fulbright had to commit to him. The agreement was for exclusive use of the plane, beginning in early May and lasting until the plane returned to Arkansas from Jamaica. Sager in effect vetoed the trip, and Fulbright abandoned the idea.

For most of May, the plane was at Memphis Aero International Aircraft Sales for repairs. Memphis Aero is privately owned, surrounded by a fence, and closed to the public. While the plane was in the repair shop, about four weeks before the trip to Jamaica, Fulbright and Harmon checked the plane for eavesdropping devices and monitoring equipment. This was done at Sager's direction; part of the deal was for Fulbright to provide security for the plane. Fulbright also, at Sager's direction, made test flights with soybeans aboard to ensure that the plane could make it off the runway in Jamaica with the marijuana. Fulbright and Livesay agreed that Little, one of Livesay's employees, would sleep on the plane to keep out intruders (like government agents). Little would be paid $1,000 and 100 pounds of marijuana.

On May 27, 1981, Thomas L. McConnell, a Customs Agent, obtained from a United States Magistrate in Memphis, Tennessee, an order allowing him to install a transponder on the plane. A transponder is a tracking device, also called a beeper. Before the beeper was installed, a government agent approached Scott Whitney, a service administrator of Memphis Aero, and told him that he had a warrant to enter the plane. Whitney consented to their going into the hangar. Later that day, the transponder was installed on the plane. The operation involved detaching a panel inside the airplane, secreting the beeper behind it, and then replacing the panel.

On June 8, 1981, Harmon, Sager, and Fulbright left for Jamaica. They picked up 1100 pounds of marijuana; Fulbright and Harmon returned to the United States, and Sager stayed in Jamaica. That night, a meeting was held including Arkansas State Police, DEA agents, and customs agents. Because of the transponder, customs agents knew the plane had left the country. Fred Clark, an Arkansas State Trooper, told the others at the meeting that an informant had told him that whenever the trip took place, the plane would land at the

airport in either Augusta or Newport. DEA Agent Buster Griggs, Customs Agent John Schulte, and several Arkansas State Troopers went to the airport in Augusta, and Clark, his sergeant, and another investigator went to Newport.

Fulbright and Harmon originally planned to land at Harmon's airstrip in Lake City, but they had trouble finding it. They contacted Livesay and Little and told them that they would be landing at Augusta. Little drove to Augusta to meet them. The plane landed. Customs officers and DEA agents approached the plane and placed Fulbright, Harmon, and Little under arrest. Griggs saw bales wrapped in opaque plastic and smelled marijuana. After determining that the men had not cleared customs, Schulte told them that he was searching the plane under his authority as a customs officer. DEA Agent Robert Morris cut one of the bags and took some of the marijuana for a field test.

Fulbright was given immunity in exchange for his testimony. Livesay also cooperated with the government, and in return was charged with only a misdemeanor. Little, Sager, and Harmon appeal their convictions, contesting the issuance of the order permitting installation of the transponder, on the ground that the affidavit does not meet constitutional requirements. The government contends that no defendant has standing to challenge the installation of the transponder. The District Court agreed, stating that defendants lack standing because they had no expectation of personal privacy in the aircraft.

## II.

### A.

Little argues that he had an expectation of privacy in the plane because he spent three or four nights on it, and his duty was to exclude others. He argues that his right to exclude, plus his interest in the cargo, his presence in the conspiracy by mid-May, the nature of the crime of conspiracy, and the security precautions he and his co-conspirators took show that he

has standing to contest the validity of the search. He cites *Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387 (1978):

> Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others … and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

(Citation omitted.)

Obviously the word "legitimate" in the phrase "legitimate expectation of privacy" is being used in a special sense. An agreement to use an airplane to transport illegal drugs, and an undertaking to guard the plane to prevent detection, are by no means legitimate. The cases must be analyzed on the hypothesis that no illegal activity is occurring or contemplated. The illegality comes to light only through execution of the warrant or court order whose validity is the very point at issue. Otherwise Fourth Amendment analysis would be pointless, because motions to suppress are never made in the first place unless evidence of criminality has been seized. So the "expectation" that must be taken as a predicate for analysis in this case is the expectation of any innocent person who has arranged with an owner or lessee to use an airplane.

■ The difficulty is that Little's right to exclude started only when he began spending nights on the plane. By then the beeper was already securely in place. He points out that the agreement for him to spend some nights on the plane was made before the transponder was installed. That agreement did not give any present rights in the plane to Little. He did not participate in the early negotiations for use of the plane. He cannot claim to have owned, possessed, or controlled the plane at the time the transponder was installed. *Cf. United States v. Torres*, 720 F.2d 1506

(11th Cir.1983) (per curiam) (defendant Gomez hired to watch marijuana in the back of a truck, arrested while guarding the marijuana; *held,* he had no standing to contest the search of the back of the truck.)

The other factors on which Little relies do not give him standing. Neither his mere presence in the conspiracy nor the acts of his co-conspirators can give him a legitimate expectation in the plane where none exists otherwise. "Coconspirators ... have been accorded no special standing." *Alderman v. United States,* 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). Billy Little cannot challenge the affidavit that was the basis of the court order allowing installation of the transponder. His motion to suppress was correctly denied.

### B.

Harmon and Sager base their claims to standing primarily on their agreement for exclusive control of the plane starting in late April or early May. Another factor evincing Sager's control is his instruction to Fulbright, which was honored, to make test flights to ensure that the plane could lift off from the runway in Jamaica. In addition, they directed Fulbright to take security measures to ensure privacy in the plane. Harmon even provided a field-strength meter, a device used to test for eavesdropping equipment.

The government argues that the airplane was at Memphis Aero for repairs during this period. It was not in condition to be flown or used by anyone. Memphis Aero had full physical control over the plane when the transponder was installed. The government also argues that if a final agreement for use of the airplane was made before the beeper was installed, it was simply an agreement for the rental of the plane for a time period to begin after the repairs were finished. The repairs were not finished, and the date for the Jamaica flight was not set until June 2, several days after installation of the transponder.

The undisputed evidence, however, shows that in late April or early May a firm agreement had been made giving Harmon and Sager exclusive use of the plane until their Jamaica trip had been completed. If the agreement had been only for future use, Sager could not have forbidden or prevented interim trips. Memphis Aero, a repair shop, cannot have control over the plane superior to the owner or lessee, or those with whom the owner or lessee contracts. The government cites *United States v. Curtis,* 562 F.2d 1153, 1156 n. 1 (9th Cir.1977), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978), but it is distinguishable. In *Curtis,* the agent of the plane's owner consented to the installation of the transponder because he suspected that the lessees were using the plane to import drugs. *Curtis* would be analogous if, in this case, Fulbright or Livesay had consented to installation of the transponder, and the evidence is uncontradicted that they did not.

*United States v. One 1967 Cessna Aircraft,* 454 F.Supp. 1352 (C.D.Cal.1978), is comparable to this case. In that forfeiture action, claimant Stephen Fischer agreed to purchase a plane. Fischer paid half the purchase price and agreed to pay the balance four days later. In the interim, the seller, Edwin Remund, kept the keys to and possession of the plane. During this period, the transponder was installed. Fischer paid for the plane. After Fischer used the plane, Customs searched it, found what was later determined to be marijuana, and seized the plane from Fischer's possession. The court found that Fischer had standing to contest installation of the transponder. He had tendered a portion of the purchase price, he had enforceable rights to the plane at the time the beeper was installed, and he was clearly the target of the installation of the transponder. He therefore had standing.

Similarly, although Sager and Harmon did not have possession of the plane, the lessees had given them control over it, they thus had a present interest in the

plane, and, being the principals of the crime, they were necessarily the targets of the transponder installation. Although their interest may not have been "property" for some state-law purposes, it is one that the Fourth Amendment was designed to protect. We conclude that both Sager and Harmon have standing to contest installation of the transponder. The District Court's unelaborated finding to the contrary is clearly erroneous.

### III.

Having decided that Harmon and Sager have standing, we now must decide whether the affidavit is valid. The Supreme Court has recently reformulated the standard for testing the validity of an affidavit used to support a warrant. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court abandoned the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 415–16, 89 S.Ct. 584, 588–89, 21 L.Ed.2d 637 (1969). The Court instead adopted a more fluid analysis, taking the "totality of the circumstances" into consideration. An informant's "veracity" and "basis of knowledge," formerly analyzed independently, are now "better understood as relevant considerations in the totality of circumstances analysis." *Gates*, 103 S.Ct. at 2329. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 2332.

 The first question is whether the flexible rule of *Gates* is to be applied here, as opposed to the older, more formal requirements of *Aguilar* and *Spinelli*. *Gates* was decided on June 8, 1983, almost exactly two years after the issuance of the warrant at issue in this case. We hold that *Gates* does apply. Defendants argue that

*Gates* was a clear break with past doctrine and therefore should not be retroactive, but they do not claim (nor could they plausibly do so) that they in any way relied to their detriment on the previous rules as to probable cause. Those rules govern the conduct of officers and courts, not of the public, and the officers are seeking retroactivity here, not resisting it. Defendants did not plan any of their own conduct in reliance on rules of law governing the requisite specificity of affidavits for search warrants. It is therefore not unfair to them to apply the new rule. In *United States v. Doty*, 714 F.2d 761 (8th Cir.1983), we applied *Gates* retroactively without discussing the retroactivity question. We now explicitly hold that it will be applied to all searches whether they took place before or after June 8, 1983.

We now turn to the particulars of the affidavit in question, in order to gauge its validity under all the circumstances, as required by *Gates*. The affidavit recites a number of bits of information attributed to "confidential informants." The informants had stated the following: that Huntsman had bought the Piper Navajo and made certain modifications at the request of Fulbright and Livesay; that Livesay and Fulbright had flown the plane for an hour at a time and then had it refueled, each time computing the exact amount of fuel used from each tank; that Huntsman had ordered a second Automatic Directional Finder (ADF), a navigational device, and the removal of the plane's air conditioner; that Livesay had agreed to pay Huntsman $30,-000 for one month's rental of the plane; that Livesay and Fulbright were using the plane to smuggle narcotics; and that Huntsman received $25,000 for each smuggling trip. In addition, the officers themselves, according to the affidavit, had the following knowledge: that in February, three months before the making of the affidavit, the airplane had been seen with all but two or three seats removed and with a life raft and a vacuum cleaner inside; and that on February 26 Huntsman had left the plane in Vero Beach, Florida, at-

tempted to bypass a security check point at the airport there, and was discovered, on inspection, to be carrying about $50,000 in cash in a suitcase.

All of the information in the affidavit, except for the direct statement in ¶ 12 that Livesay and Fulbright were using the plane to smuggle narcotics, is consistent with lawful activity. (It is also—and here we accept the judgment of the affiant as an experienced officer—characteristic in some respects of drug-smuggling flights in the Caribbean.) This direct accusation of unlawful use of the plane is attributed simply to "a confidential informant." The affiant does not even add the conclusory statement that this informant is "reliable." The other confidential informants referred to are described as "reliable," but only one of them is said to "have provided reliable information in the past," ¶ 6, and in no case are any details given of past information received that had been verified. No corroboration is given of the information about installation of an additional ADF, removal of the air conditioner, test flying of the plane, and payment of monthly rental. Nor is there any corroboration of the smuggling accusation in ¶ 12.

■ We are required to construe affidavits in a nontechnical, common-sense fashion, and to defer to the judgment of the issuing Magistrate whenever reasonably possible. After attempting to do so in this case, we are nevertheless of the opinion that this affidavit does not pass muster. Comparison with the facts of *Gates* will help to explain why. There, the Bloomingdale, Illinois, police had received an anonymous letter accusing Sue and Lance Gates of selling drugs and predicting that in early May they would make a trip to Florida and drive back with a trunk full of contraband. Nothing was known of the informant. It could not be said that he or she was reliable or had furnished information in the past. But investigation did corroborate much of the letter: the police observed Lance Gates flying to Florida, meeting a woman who appeared to be his wife, and driving out of Florida on a highway fre-

quently used to travel to the Chicago area. Only then did the officers apply for and receive a warrant.

The Court observed "that, standing alone, the anonymous letter ... would not provide the basis for a magistrate's determination that there was probable cause .... The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the [defendants'] criminal activities." 103 S.Ct. at 2326. It was the "corroboration of major portions of the letter's predictions," *id.* at 2336, that persuaded the Court to hold the affidavit before it sufficient. The letter "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted," *id.* at 2335, and the officers' investigation, conducted after receiving the letter and before applying for the warrant, corroborated many of these details. If, in the case before us, a similar investigation had occurred verifying the accusation of the informant that international flights were taking place, this case would be closer to *Gates,* but there was no such investigation. Nor was there anything of the kind' of after-the-fact corroboration that occurred in that case. We are mindful that completely innocent activity can provide sufficient corroboration in some circumstances. The fact remains, however, that even under *Gates* "a conscientious assessment of the basis for crediting ... tips is required by the Fourth Amendment," *id.* at 2332. The affidavit before us does not contain enough of such a basis to warrant the conclusion that there was "a fair probability that contraband or evidence of a crime [would] ... be found in" the airplane. *Ibid.*

■ Similarly, in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), cited and relied on by the *Gates* court at some length, an informant's tip that Draper would arrive on a particular train dressed in a particular

fashion was held sufficient to justify a finding of probable cause, but only after the arresting officer "had personally verified [virtually] every facet of the information given him by" the informant. *Id.* at 313, 79 S.Ct. at 333. Furthermore, in *Draper* the informant had been engaged as an employee of the police for about six months, had given information from time to time in the past, and had always been found accurate and reliable. Here, as we have already indicated, no details whatever to justify a conclusion of reliability as to any of the informants are contained in the affidavit.[1] We conclude that the affidavit was insufficient and that the Magistrate's order authorizing installation of the transponder was therefore invalid.

All evidence derived from the court order must be suppressed. Evidence to be suppressed includes the plane's crossing the border, the plane's return on June 9, and everything, including the marijuana, discovered after the plane landed. The convictions of Sager and Harmon must be reversed unless the search can be sustained on other ground.

### IV.

■ The government argues that even if the warrant is invalid, the search can be upheld on the basis of consent. Viewing the facts in the light most favorable to the government, we have Whitney's consent to enter the hangar. No one, however, gave consent (probably no one at Memphis Aero had authority to give consent) to enter the plane and remove a panel to install an electronic tracking device. The search cannot be upheld as a consent search. *Cf. Marvin v. United States*, 732 F.2d 669, at 675–676 (8th Cir.1984) (renter of house cannot consent to search of owner's private business records left in the house).

■ The government also argues that the search can be upheld as a valid border search. But there is no evidence, untainted

by the use of the transponder, that the officers had a reasonable basis for believing that the aircraft would be at the Augusta airport in the early morning hours on June 9, 1981. See *United States v. One 1967 Cessna Aircraft, supra,* 454 F.Supp. at 1359. The government argues that information received from an Arkansas State Trooper, Fred Clark, would have led to the Augusta airport entirely apart from the transponder. On June 5, 6, or 7, independently of Customs Agent McConnell, Clark received a tip from an informant that Fulbright and Livesay would be leaving in a week or so, heading to Jamaica or Colombia to smuggle drugs. His informant told him that they would be landing at either Augusta or Newport, Arkansas. Clark found out that the plane was at Newport and drove to the airstrip. He saw Fulbright standing next to the plane that had been described to him. Clark told his sergeant about the tip.

The answer to the government's independent-source argument is that State Trooper Clark's information did not include the date or time the plane would be leaving or returning. No source independent of the transponder informed the government agents that the plane would take off on June 8, 1981, cross the border, and then return on June 9, 1981. Without the transponder, the officers would not have known when to cover the two airports. The search of the plane cannot be upheld as a border search.

Other contentions on appeal are Little's arguments that the U.S. Attorney's comment on his failure to cooperate violated his Fifth Amendment right to remain silent, and that the court erred in not giving his requested jury instruction on a smaller conspiracy within a larger one. Both Little and Harmon argue that the trial court erred in not severing the defendants for trial. We have reviewed the record and

---

**1.** The government says that one of the informants (though apparently not the one who flatly accused Fulbright and Livesay of using the plane to run drugs) was "an innocent eyewit-

ness." Brief of Appellee 15. This characterization was not in the affidavit and therefore cannot be used as part of the justification for the transponder-installation order.

conclude that these arguments have no merit and warrant no discussion.

In sum, we conclude that Billy Little's conviction must be affirmed. Sager and Harmon have standing to challenge the court order, and the court order is invalid. The evidence on which their convictions are based must be suppressed, and their convictions must therefore be reversed, and their cases remanded for further proceedings consistent with this opinion.

It is so ordered.