[No. A026489. First Dist., Div. Five. June 19, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE LISSAUER, Defendant and Appellant.

416

**COUNSEL**

Marvin W. Friedman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**HANING, J.**—Defendant/appellant Lawrence Lissauer pled guilty to possession of marijuana for sale (Health & Saf. Code, § 11359) following denial of his motion to suppress evidence seized during a warrantless search of his automobile. He appeals on the grounds that information provided to the police by Pacific Telephone Company without a warrant, and the warrantless search of his vehicle and a closed container therein, constituted unreasonable searches under the federal (U.S. Const., IV Amend.) and state (Cal. Const., art. I, § 13) Constitutions, rendering the seized marijuana inadmissible. We conclude there was no probable cause for the arrest and search, and reverse.

Subsequent to the conviction and appellate briefing herein, our Supreme Court ruled in *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744], that independent state grounds supporting the exclusionary rule established in *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], were abrogated by the provisions of Proposition

8.[1] Proposition 8 applies to all offenses committed on or after its effective date of June 9, 1982. (*People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].) Thus, the validity of searches and seizures in post-Proposition 8 offenses is tested by Fourth Amendment standards, and we review appellant's conviction in that light.

On July 16, 1983, San Francisco Police Officer Pelham Wilmerding and other officers set up surveillance at a residence at 315 Magee in Mill Valley. Wilmerding had received information that a person named "Lawrence Nathan" was going to deliver narcotics to San Francisco.

The information leading to the surveillance was provided by an informant to San Francisco Police Officer Edward Santos, Jr. The informant had an undisclosed criminal record and was found in possession of "certain controlled substances in a not-too-distant time frame from [the surveillance]." Although it is unclear when the informant began giving Santos his information, Santos testified that he had received some information four or five days before appellant's arrest. The informant was not officially under arrest when he provided the information, but "was made to work" for Santos. There was no evidence that the informant had ever provided information prior to this occasion.

According to the informant, a man named "Larry" would be making a delivery of 10 pounds of marijuana to San Francisco. Apparently, there were to be two stops, one of which was to be at the informant's apartment and the other unknown. The informant told Santos that "Larry" lived "in Marin County, somewhere, an address unknown," although he was able to provide a telephone number. Santos obtained the address for this telephone number through another officer who contacted the "phone security of Pacific Telephone." The record is silent as to whether this phone number was listed in Pacific Telephone's public directory.

The informant told Santos that "Larry" drove a newer model two-door sedan. The marijuana was to be transported "in duffel bags, shoulder bag, or brown paper bags, very loosely in the back seat of his car, or in the general reaching area of his person."

The informant described "Larry" as "an older gentleman, sort of somewhat balding, about five-nine, maybe 150-160 pounds, black hair." Based on this information, Santos commenced an investigation into "Larry's"

---

[1]Specifically, Proposition 8 added, inter alia, section 28 to article I of the California Constitution. Subdivision (d) thereof states, in relevant part, that "relevant evidence shall not be excluded in any criminal proceeding . . . ."

identification. Although it is unclear how he did it, Santos discovered appellant's vehicle license plate number, presumably based on the name he received from the telephone company. A registration check showed the vehicle registered to Lawrence Nathan Lissauer.

Santos further testified that his informant first told him that "the deal" was supposed to take place at about 1 p.m., but later advised him the transaction was scheduled between 4 and 5 p.m. The record does not reveal how the informant obtained this information. Although the record contains a general reference to telephone calls, it is otherwise silent on this point.

Based on the foregoing information, Officers Wilmerding, Lundberg and Tyrell set up surveillance at 315 Magee in Mill Valley. At approximately 3 p.m., the officers observed a car driving away from 315 Magee. They followed it to another residence in Mill Valley, where it stopped for about 15 minutes. Wilmerding testified he did not see the occupant of the vehicle get out. However, he did see the car drive off again. He and the other officers followed it until it entered Highway 101, travelling northbound. Somewhere along Highway 101 all the surveilling officers lost sight of the vehicle. Tyrell and Lundberg then proceeded southbound on Highway 101 to the Golden Gate Bridge tollbooth. Wilmerding also proceeded southbound to Marina Boulevard and Baker Street in San Francisco.

During the surveillance of appellant's car in Marin County, Santos was either with the informant at his apartment or in a parking lot directly across from it. He was in radio contact with the other officers during this period.

Lundberg spotted the vehicle travelling south into San Francisco from Marin County at approximately 4:40 p.m. Santos, accompanied by Officer Roche, then left the informant to intercept the car at Filbert Street and Van Ness Avenue in San Francisco. After following appellant's car for three to four blocks along Van Ness, Santos and Roche, along with Sergeant Martel (who was following in another car), pulled appellant over. Roche testified that when he approached appellant's car he noticed marijuana protruding from an open brown shoulder bag lying on the back seat. Roche ordered appellant out of his car at gunpoint and arrested him. Santos then searched the trunk of appellant's car and found marijuana. At the suppression hearing, the court specifically rejected Roche's testimony and found that the marijuana was *not* visible to the police.[2]

---

[2]The record contains a tape recording of the police radio communications during the surveillance. As the trial court noted, the original plan was to follow appellant in the hope that he would visit the informant, and then arrest him after the marijuana had been transferred. However, midway through the surveillance the informant became reluctant to cooperate, thereby leaving the police in a quandary. They candidly discussed manufacturing a

## I

Whether appellant's telephone number and address were listed need not be determined. As a consequence of *Lance W.,* we conclude that the police did not require a warrant to obtain appellant's name and address from the telephone company. Although prior California law would have barred its reception (*People* v. *Chapman* (1984) 36 Cal.3d 98 [201 Cal.Rptr. 628, 679 P.2d 62]; *People* v. *Blair* (1979) 25 Cal.3d 640 [159 Cal.Rptr. 818, 602 P.2d 738]), the Fourth Amendment does not. In *Blair,* records of telephone calls made by the defendant from his hotel room and obtained by the police without a warrant were held to be inadmissible, based on the search and seizure provision of the California Constitution, article I, section 13.

Thereafter, the United States Supreme Court decided *Smith* v. *Maryland* (1979) 442 U.S. 735 [61 L.Ed.2d 220, 99 S.Ct. 2577], wherein the high court denied Fourth Amendment protection to records of telephone numbers dialed by a criminal suspect from his home. The record was obtained by the warrantless and surreptitious installation of a pen register at the telephone company's office on the suspect's line. A pen register is an electronic device which assembles a permanent record of the numbers dialed from a particular phone. *Smith* rationalized that the defendant did not possess an expectation of privacy which society is prepared to recognize as reasonable. (*Smith* v. *Maryland, supra,* 442 U.S. at p. 740 [61 L.Ed.2d at p. 227]; see also *Katz* v. *United States* (1967) 389 U.S. 347, 361 [19 L.Ed.2d 576, 588, 88 S.Ct. 507].)

*Chapman* directly addressed the privacy issue of protection of the name and address of telephone subscribers, and held that the California Constitution (prior to its amendment by Prop. 8) prohibited the release of such information without a warrant. The *Chapman* court recognized that such protection does not exist under federal law. (*People* v. *Chapman, supra,* 36 Cal.3d at p. 107, fn. 5.) As a result of Proposition 8 and *In re Lance W., supra,* 37 Cal.3d 873, we conclude that the police did not require a warrant to obtain and use the telephone company's records containing appellant's name and address.

---

reason to stop appellant's vehicle. At one point they were looking for a marked patrol car to stop appellant under the pretext of a vehicle code violation. They ultimately decided to "jam" (police jargon for a stop) the suspect on the spot, rather than wait for probable cause to emerge. Haste makes waste.

The defendant testified during the suppression hearing, so the trial court had the benefit of his testimony as well before making its finding that the marijuana was not visible to the police prior to the search. Apparently the deputy district attorney had not reviewed the police communications tape in advance of the suppression hearing, and it was not in evidence at the preliminary hearing.

## II

The arresting officers were initially justified in stopping appellant if only for purposes of investigation. Respondent correctly points out that circumstances short of constituting probable cause to arrest may be sufficient to justify a brief investigative detention. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868]; *In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957].) Likewise, "the 'tip' which triggers investigative action, unlike that which creates grounds for arrest, need not come from a source of proven reliability." (*People* v. *Stephenson* (1969) 268 Cal.App.2d 908, 911 [74 Cal.Rptr. 504]; *People* v. *Superior Court* (*McBride*) (1981) 122 Cal.App.3d 156, 163 [175 Cal.Rptr. 723].)

Investigative detention is determined by "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 19 [20 L.Ed.2d at p. 904]; *In re Tony C., supra,* 21 Cal.3d at p. 892.) While an anonymous tip does not provide probable cause for arrest or search, it is sufficient for investigative action. (*People* v. *Superior Court* (*McBride*), *supra,* 122 Cal.App.3d at p. 163.) However, the mere cause to investigate does not, without more, necessarily permit arrest, search or detention. (*Terry* v. *Ohio, supra; In re Tony C., supra.*)

In *United States* v. *Ross* (1982) 456 U.S. 798 [72 L.Ed.2d 572, 102 S.Ct. 2157], the United States Supreme Court held that a vehicle may be searched by police officers having probable cause to believe it contains contraband. The scope of the search extends to every part of the vehicle, including containers therein, which may conceal the contraband. The only restraint on the search is probable cause, which *Ross* defines as "objective facts that could justify the issuance of a [search] warrant by a magistrate . . . ." (*Id.,* at p. 808 [72 L.Ed.2d at p. 583].) The searching officers in *Ross* were acting upon information supplied by a known, reliable informant.

In *Illinois* v. *Gates* (1983) 462 U.S. 527 [76 L.Ed.2d 527, 103 S.Ct. 2317], the high court redefined the basis for the issuance of search warrants and held: "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation.]" (*Id.,* at p. 238 [76 L.Ed.2d at p. 548].)

■ Thus, if the known facts in the instant case constituted sufficient probable cause to support the issuance of a search warrant, *Ross* permits the search. The bottom line inquiry then becomes whether the police investigation is sufficiently corroborative of the untested informant's tip to provide probable cause.[3]

*Gates* discusses the issue of corroboration of an informant's tip, citing *Jones* v. *United States* (1960) 362 U.S. 257 [4 L.Ed.2d 697, 80 S.Ct. 725] and *Draper* v. *United States* (1959) 358 U.S. 307 [3 L.Ed.2d 327, 79 S.Ct. 329], as examples. Both *Jones* and *Draper* involved known, reliable informants. In *Gates,* the police received an anonymous tip[4] which the court found to be corroborated by independent police investigation.[5] The high court characterized the police investigation as evidence which "standing alone, . . . suggested that the Gates were involved in drug trafficking."

---

[3]In light of the trial court's finding that the police did not view any contraband in plain sight when they approached appellant's vehicle, we need not decide whether the initial stop was a valid investigatory procedure. The vehicular search was not consensual; appellant was immediately removed from his car and arrested, and no attempt was made to question him or obtain permission for the search.

[4]The police in *Gates* received an anonymous handwritten letter which stated: " 'This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,000.00 worth of drugs in their basement. [¶] They brag about the fact they never have to work, and make their entire living on pushers. [¶] I guarantee if you watch them carefully you will make a big catch. They are friends with some big drugs dealers, who visit their house often. . . .' " (*Illinois* v. *Gates, supra,* 462 U.S. at p. 225 [76 L.Ed.2d at p. 540].)

[5]"The letter was referred by the Chief of Police of the Bloomingdale Police Department to Detective Mader, who decided to pursue the tip. Mader learned, from the office of the Illinois Secretary of State, that an Illinois driver's license had been issued to one Lance Gates, residing at a stated address in Bloomingdale. He contacted a confidential informant, whose examination of certain financial records revealed a more recent address for the Gates, and he also learned from a police officer assigned to O'Hare Airport that 'L. Gates' had made a reservation on Eastern Airlines flight 245 to West Palm Beach, Fla., scheduled to depart from Chicago on May 5 at 4:15 p.m. [¶] Mader then made arrangements with an agent of the Drug Enforcement Administration for surveillance of the May 5 Eastern Airlines flight. The agent later reported to Mader that Gates had boarded the flight, and that federal agents in Florida had observed him arrive in West Palm Beach and take a taxi to the nearby Holiday Inn. They also reported that Gates went to a room registered to one Susan Gates and that, at 7:00 a.m. the next morning, Gates and an unidentified woman left the motel in a Mercury bearing Illinois license plates and drove northbound on an interstate frequently used by travelers to the Chicago area. In addition, the DEA agent informed Mader that the license plate number on the Mercury registered to a Hornet station wagon owned by Gates. The agent also advised Mader that the driving time between West Palm Beach and Bloomingdale was approximately 22 to 24 hours." (*Illinois* v. *Gates, supra,* 462 U.S. at pp. 225-226 [76 L.Ed.2d at pp. 540-541].)

(*Illinois* v. *Gates, supra*, 462 U.S. at p. 243 [76 L.Ed.2d at p. 551].) The police investigation confirmed that Mr. Gates flew from Chicago to Florida, met a woman (presumably his wife) and drove out of town with her in his car, heading back toward Chicago. The court noted that Florida was a well known source of narcotics and illegal drugs, and that Mr. Gates' activity was "as suggestive of a pre-arranged drug run, as it is of an ordinary vacation trip." (*Id.,* at p. 243 [76 L.Ed.2d at p. 551].) The court went on to note that the anonymous letter "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." (*Id.,* at p. 245 [76 L.Ed.2d at p. 552].) The corroboration of these facts through independent police investigation provided the probable cause[6] in *Gates*.

 While observation of innocent activities can provide sufficient corroboration of an unknown or untested informant's tip to establish probable cause (*Illinois* v. *Gates, supra*, 462 U.S. at p. 243 [76 L.Ed.2d at p. 551]; *United States* v. *Little* (8th Cir. 1984) 735 F.2d 1049, 1055; *United States* v. *Mendoza* (5th Cir. 1983) 722 F.2d 96, 101), the "veracity" and "basis of knowledge" of the informant must be assessed together with all the circumstances to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois* v. *Gates, supra*, at p. 238 [76 L.Ed.2d at p. 548]; *United States* v. *Little, supra*, at p. 1049; *United States* v. *Kolodziej* (5th Cir. 1983) 712 F.2d 975; *In re Grand Jury Proceedings* (8th Cir. 1983) 716 F.2d 493; cf. *United States* v. *Mendoza, supra*, 722 F.2d 96; see also *United States* v. *Harris* (1971) 403 U.S. 573 [29 L.Ed.2d 723, 91 S.Ct. 2075]; *United States* v. *Larkin* (9th Cir. 1974) 510 F.2d 13; *United States* v. *Archuleta* (9th Cir. 1971) 446 F.2d 518; *United States* v. *Prueitt* (9th Cir. 1976) 540 F.2d 995.) As *Gates* indicates, the informant's "veracity" and "basis of knowledge" are still factors to be balanced and considered in the totality of the circumstances from which the determination of probable cause is made. (*Illinois* v. *Gates, supra*, 462 U.S. at p. 230 [76 L.Ed.2d at p. 543].) It is apparent from the cases that proven, reliable informants[7] require less corroboration

---

[6]Prior to passage of Proposition 8, the corroboration required to support an untested informant under California law had to relate to criminal activity. Information which merely related to the suspect generally was insufficient to supply probable cause. (*People* v. *Fein* (1971) 4 Cal.3d 747, 752-753 [94 Cal.Rptr. 607, 484 P.2d 583].)

[7]As examples of known reliable informants, see *Rugendorf* v. *United States* (1964) 376 U.S. 528 [11 L.Ed.2d 887, 84 S.Ct. 825]; *Jones* v. *United States, supra*, 362 U.S. 257; *Draper* v. *United States, supra*, 358 U.S. 307; *United States* v. *Francesco* (1st Cir. 1984) 725 F.2d 817; *United States* v. *Lessard* (8th Cir. 1983) 720 F.2d 1000.

However, compare, *In re Grand Jury Proceedings, supra*, 716 F.2d 493, where the informant's reliability was unquestioned, but the basis of his knowledge was not established.

to provide probable cause than those who are unknown or untested.[8] In situations involving untested informants, such as *Gates, Prueitt* and *Larkin*, the quantum of detail, particularly as it describes subsequently verified future activity, is regarded as a significant factor in assessing the informant's reliability, unless, of course, the independent police investigation reveals patently criminal activity.

■ The facts and circumstances relied upon by Officers Roche and Santos in the instant case came from three sources: the informant, independent police work, and some corroborative behavior on the part of appellant. From the informant, the officers learned that a man named "Larry," who lived somewhere in Marin County, with a certain telephone number, was allegedly going to make a delivery of marijuana to San Francisco at a certain time and date. The informant also provided a physical description of "Larry," a description of his car, and generally where "Larry" would keep the marijuana. Based on this information, Santos traced appellant's address through the phone company and obtained appellant's license plate number. The informant's tip was corroborated by surveillance of appellant's car leaving Marin County at approximately the time designated by the informant and driving into San Francisco, by appellant's name (Lawrence-Larry), by appellant's resemblance to the informant's description, and by appellant's possession of a shoulder bag in his vehicle, as described by the informant.

The basis of the informant's knowledge is not revealed. There is no indication that he ever purchased or obtained marijuana or any contraband from appellant on any previous occasion. There is no evidence that he even knew appellant. The information he gave the police about appellant, other than the fact that he would be carrying marijuana, was such as could be acquired by any casual observer. Because the informant had previously been arrested, but not charged, apparently in exchange for his testimony, his information was suspect. (*United States* v. *Kolodziej, supra,* 712 F.2d at p. 978; see also *United States* v. *Larkin, supra,* 510 F.2d at p. 15, fn. 2.) The independent investigation by the police revealed nothing which was even remotely suspicious. Unlike Florida, Mill Valley has acquired no reputation as an import center for illegal drugs. In short, there was no probable cause. (See, e.g., *United States* v. *Larkin, supra; United States* v. *Little, supra,* 735 F.2d 1049.)

---

[8]As examples of unknown or untested informants, see *Illinois* v. *Gates, supra,* 76 L.Ed.2d 527; *United States* v. *Harris, supra,* 403 U.S. 573; *United States* v. *Little, supra,* 735 F.2d 1049; *United States* v. *Mendoza, supra,* 722 F.2d 96; *United States* v. *Kolodziej, supra,* 712 F.2d 975; *United States* v. *Prueitt, supra,* 540 F.2d 995; *United States* v. *Larkin, supra,* 510 F.2d 13; *United States* v. *Archuleta, supra,* 446 F.2d 518.

The judgment is reversed.

Low, P. J., and King, J., concurred.