Filed 9/20/16  P. v. Thomas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041856 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1347642) |
| v. | |
| GERRY JAMAR THOMAS, | |
| Defendant and Appellant. | |

Defendant Gerry Jamar Thomas pleaded no contest to possession of methamphetamine for sale (Health & Saf. Code, § 11378) after his motion to suppress evidence was denied (Pen. Code, § 1538.5).  Thomas was arrested without a warrant after a confidential informant tipped a detective that an individual matching Thomas's description would arrive at a specified time in a parking lot known for drug deals driving a white, full-size van carrying methamphetamine.  On appeal, Thomas contends the suppression motion should have been granted because corroboration of the informant's tip was insufficient to provide probable cause for Thomas's arrest.  For the reasons set forth below, we disagree and affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    MOTION TO SUPPRESS

In his motion to suppress, Thomas argued there was no probable cause for his arrest, which occurred without a warrant after he exited his vehicle in a Safeway parking lot in Santa Clara.  Thomas sought to suppress the evidence seized as a result, including

$2,474 found on his person and 123.0 grams of suspected methamphetamine found in his vehicle.

The People contended in their written opposition that the arrest was supported by probable cause obtained from an informant's tip as corroborated by independent police investigation. At the outset of the suppression hearing, however, the trial court stated the scope of its inquiry was whether the corroborated tip was sufficient "for the initial detention of Mr. Thomas." Following the presentation of evidence, the trial court indicated it would find that an arrest and not a detention had occurred.

The prosecutor contested the trial court's finding and argued that the question before the court was whether there were sufficient predictive factors based on the tip and police corroboration to support a detention, not an arrest. The prosecutor further argued that Thomas's resistance to the detention resulted in his arrest for resisting or obstructing an officer (Pen. Code, § 148), after which the searches of Thomas and his vehicle was proper incident to his arrest and as an inventory search. The defense maintained its position that Thomas had been arrested from the outset without probable cause.

The following facts were elicited at the hearing.[1]

### Testimony of Detective Thompson

At around 2:00 p.m. on December 28, 2012, Santa Clara Police Detective Jacob Thompson received a tip from a confidential informant about a drug deal that would take place that afternoon.

Detective Thompson had been a police officer for six years, including three years as a narcotics detective. Prior to that he was a deputy sheriff for Santa Cruz County. Detective Thompson underwent specialized training to become a narcotics detective and had field training experience teaching new recruits how to investigate narcotic-related activity. As a narcotics detective, he had bought methamphetamine and cocaine, had

---

[1] The hearing on the motion to suppress took place over two days.

2

participated in over 30 search warrants, and with the team that he worked with had made hundreds of arrests for "controlled-buys" and "in-hand buys." The trial court qualified Detective Thompson as an expert in narcotics trafficking in Santa Clara.

From the tip, Detective Thompson learned that methamphetamine would be delivered at about 3:15 p.m. that same afternoon to the Safeway parking lot located at 2605 The Alameda in Santa Clara. The methamphetamine would be delivered in an older, white, "full-size" van driven by a light-skinned black male in his early 30s with short hair. Detective Thompson was familiar with different types of vans and understood "full-size" to refer to a "work-van" that could seat multiple people within an area in the back. Detective Thompson did not recall the tip providing any additional details about the van.

Citing Evidence Code sections 1040 and 1042, Detective Thompson declined to answer any questions about the informant or the informant's source of knowledge. He could not recall the amount of drugs referenced in the tip, though he believed it was approximately the amount recovered from the van. There was no description of the drug's packaging or how it would be delivered or carried. Detective Thompson knew the parking lot referenced in the tip was "one of the major places narcotics are sold" in Santa Clara. He personally had done "multiple deals" and made "easily" more than 10 narcotics arrests at that location.

Detective Thompson, his supervisor, and a team of officers acted on the tip. The team staked out the Safeway parking lot and adjacent areas. Detective Thompson was in an unmarked police vehicle in the Taco Bell parking lot connected to the Safeway lot, together with another individual who was not a police officer. Detective Thompson invoked Evidence Code sections 1040 and 1042 and did not answer any questions about the individual in his vehicle. He declined on the same basis to answer questions about whether the tip had provided a description of the intended recipient of the drugs or how

3

the informant was familiar with the van. The trial court sustained invocation of the privilege.

At 3:13 p.m., Detective Thompson observed a full-size, older mid-to-late 1990s white van enter the Safeway parking lot at the Taco Bell entrance. The van passed by Detective Thompson, who was able to see the driver; he noted there was no front passenger but could not see if there were passengers in the back. The van and the driver matched their descriptions from the tip. The van parked at the far end of the Safeway parking lot, about 35 to 50 yards from where Detective Thompson was parked.

Detective Thompson relayed to the other officers the arrival of the van, where it was parking, and that the occupant matched the description provided by the informant. Detective Thompson did not recall if he gave the "bust signal" at that time; "but a decision was made to contact the defendant."[2] Detective Thompson did not remember seeing any other white vans or light-skinned black male adults in their early 30s in the parking lot. He explained that the investigation team already "would have gone into the parking lot . . . [to] look for similar-type vehicles and eliminate them as suspect vehicles."

Detective Thompson saw the driver get out of the vehicle, briefly disappear from view, then reappear within seconds at the rear of the van. Santa Clara Police Officer Travis Niesen was one of the officers stationed at the Safeway parking lot. From a distance, Detective Thompson saw Officer Niesen make contact with the driver and what appeared to be a "brief struggle" in which the officer "was having trouble controlling the driver." At the point of seeing the "brief struggle," Detective Thompson had begun to drive away from the parking lot. Detective Thompson testified that when approaching a

---

[2] Detective Thompson testified that "bust signal" means "move to go and contact the person that we're looking for," but agreed on cross examination that "typically" what a " 'bust signal' means is to go arrest a person."

person suspected of dealing methamphetamine, it "would not be uncommon" and "would be appropriate for the safety of the officers and the . . . individual" to detain the person in handcuffs. So far as Detective Thompson knew, after the brief struggle, Thomas was arrested for controlled substances charges.

*Testimony of Officer Niesen*

Detective Thompson had briefed the other officers at the scene, including Officer Travis Niesen. Officer Niesen saw the van enter the parking lot and park. He could not see if anyone else was inside the back of the van. Officer Niesen testified "that this was the van, driven by the suspect, for the methamphetamine drug deal." Officer Niesen invoked Evidence Code sections 1040 and 1042 and did not testify whether he had any knowledge that the person delivering the drugs had been involved in prior sales. Based on his training and experience, Officer Niesen knew that drug dealers often carry weapons and can react unpredictably when confronted by police, and on that basis assessed Thomas to be a "potential danger" as a dealer.

Officer Niesen could not recall if Detective Thompson or somebody else gave the "bust signal," which meant "to go in and detain the suspects associated with the vehicle and the suspect." Driving an unmarked police car with the siren activated, Officer Niesen "pulled within 5 feet of" the rear bumper of the van, where Thomas was standing. Another officer in full uniform, Officer Sitler, was the front passenger in the police car. Officer Niesen made contact with the driver, Thomas, while Officer Sitler exited the passenger side to clear the van, which was empty of passengers. Officer Niesen had his gun drawn, was wearing a black shirt with "Police" in big bold letters and his badge, and shouted "Police" and "Let me see your hands" several times. Officer Sitler also yelled "Police," and Officer Niesen could see other officers were approaching and in Thomas's line of sight. Thomas did not respond as Officer Niesen expected, but "just looked at me with a—with a stoic face, kept his hands at his sides, and didn't really respond, which was very strange to me."

5

Officer Niesen holstered his gun, grabbed Thomas's right arm, and spun him toward the hood of the police vehicle a few feet away. As Officer Niesen reached for his handcuffs, Thomas—who was wedged but not pinned between the officer and the car, pushed away, causing Officer Niesen to lose his grasp. Officer Niesen described Thomas as "trying to wiggle and move and get out." Officer Niesen forced Thomas to the ground and got on top of him while calling to the nearby officers.

Officer Niesen testified that the arrest was for resisting arrest (Pen. Code, § 148), and the search of Thomas's person was incident to the arrest. Thomas was carrying a wallet with his driver's license and money, a black cell phone, and more money in his pants pocket. A search of the van uncovered narcotics, though no specific evidence of the search or amount of drugs was presented at the hearing on the motion to suppress.[3]

*Trial Court Ruling*

The trial court denied the motion to suppress. The court found the testimony of Detective Thompson and Officer Niesen was credible. Under the objective standard to determine a detention versus an arrest, the court concluded "there was a formal arrest." The court also found that the officers had corroborated the information provided by the informant, including the location, time, description of the vehicle and the person, and the "the essential plan of the drug exchange." The court ruled that these facts, along with the detective's knowledge of drug trafficking in Santa Clara, supplied probable cause to arrest Thomas for the narcotic offense. The court accordingly found the vehicle search

---

[3] According to the record, the van search revealed a container inside the van with a false compartment containing 123.0 grams of methamphetamine, as well as a collapsible baton and an electronic control device. Thomas had been carrying approximately $2,400 cash when he was arrested.

was proper under *Arizona v. Gant*.[4]  The court did not rule whether there also was probable cause to arrest Thomas for resisting an officer.

### B.    PROCEEDINGS AFTER DENIAL OF THE MOTION TO SUPPRESS

The information filed on July 3, 2013, by the Santa Clara County District Attorney charged Thomas as follows:  possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 1) in excess of 28.5 grams within the meaning of Penal Code section 1203.073, subdivision (b)(2); transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 2); possession of a billy (Pen. Code, § 22210; count 3); possession of a stun gun by a felon (*id*., § 22610, subd. (a); count 4); and misdemeanor possession of a false compartment with intent to conceal controlled substances (Health & Saf. Code, § 11366.8, subd. (a); count 5).

After the denial of his motion to suppress, Thomas agreed to a plea agreement.  He pleaded no contest to count 1 for possession of methamphetamine for sale (Health & Saf. Code, § 11378).  Pursuant to the plea agreement, the trial court suspended imposition of sentence as to count 1 and placed Thomas on three years of formal felony probation conditioned on Thomas serving 60 days in county jail, for which he was awarded credit for time served and could serve the remaining time on a weekend work program.  The court dismissed the other counts and imposed probation conditions, restitution, fines, and fees.

## II.    DISCUSSION

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." (U.S. Const., 4th Amend.)  This guarantee applies to the states through the Fourteenth

---

[4] The Supreme Court in *Arizona v. Gant* (2009) 556 U.S. 332, 351, decided in relevant part that a vehicle search incident to the recent occupant's arrest may be justified when it is reasonable to believe the vehicle contains evidence of the offense of the arrest.

7

Amendment (*Mapp v. Ohio* (1961) 367 U.S. 643) and, in California, defines the standard by which courts decide claims relating to the exclusion of evidence on the ground of unreasonable search and seizure.  (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*); *People v. Camacho* (2000) 23 Cal.4th 824, 830.)

"A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search." (*People v. Redd* (2010) 48 Cal.4th 691, 719.)  "In reviewing the trial court's suppression ruling, we defer to its factual findings if supported by substantial evidence.  We independently assess the legal question of whether the challenged search or seizure satisfies the Fourth Amendment." (*People v. Brown* (2015) 61 Cal.4th 968, 975; *People v. Camacho*, *supra*, 23 Cal.4th at p. 830; *People v. Weaver* (2001) 26 Cal.4th 876.)

A. **WARRANTLESS ARREST FINDING**

Whether Officer Niesen initially detained or arrested Thomas was at issue at the suppression hearing.  Contrary to the People's written opposition to the motion to suppress, the prosecutor argued at the suppression hearing that Officer Niesen first detained Thomas and only arrested him for resisting arrest under Penal Code section 148.

The trial court rejected the prosecution's characterization of Thomas's seizure as a detention, but found there was probable cause for Thomas's arrest.  The court determined the search of the van was justified because it was reasonably likely that evidence related to the drug offense would be found in the vehicle under *Arizona v. Gant*, *supra*, 556 U.S. at page 351.  The court did not decide whether there was additional probable cause to arrest based on resisting arrest (Pen. Code, § 148).  On appeal, the People disagree with the trial court's assessment on this point but do not directly challenge the ruling.

An investigative detention may be distinguished from a de facto arrest by determining " 'whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' " (*Celis*, *supra*, 33 Cal.4th at p. 675.)

8

Even though Detective Thompson and Officer Niesen testified that the "bust signal" did not necessarily indicate an arrest was to be made, there was no evidence that Officer Niesen's approach with gun drawn—while other officers also were approaching and before any effort to observe Thomas's comportment, conduct in the parking lot, or whether he was accompanied—constituted a detention of the least intrusive means available under the circumstances in order "to quickly dispel or confirm police suspicions of criminal activity." (*Id*. at p. 676.)

We therefore decline to disturb the trial court's factual finding of arrest, which the People have not challenged as unsupported by substantial evidence (see *People v. Camacho*, *supra*, 23 Cal.4th at p. 830 [reviewing court upholds factual findings supported by substantial evidence]) and proceed on the assumption that Officer Niesen arrested Thomas upon first contact at the rear of the van.

## B.    PROBABLE CAUSE

An arrest, whether pursuant to or in the absence of a warrant, must be made only upon a showing of probable cause. (*People v. Campa* (1984) 36 Cal.3d 870, 879.) "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing the law in the community's protection.' " (*Maryland v. Pringle* (2003) 540 U.S. 366, 370, quoting *Brinegar v. United States* (1949) 338 U.S. 160, 176.) As courts often reiterate, probable cause is a practical, nontechnical, fluid concept, "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." (*Maryland v. Pringle*, *supra*, at p. 371; *Illinois v. Gates* (1983) 462 U.S. 213, 231-232 (*Gates*).)

In determining whether there was probable cause for an arrest, "we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." (*Maryland v. Pringle*, *supra*, 540 U.S. at p. 371.) "Probable cause exists when

9

the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime." (*Celis*, *supra*, 33 Cal.4th at p. 673.) Simply stated, "probable cause means 'a fair probability that contraband or evidence of a crime will be found.' " (*United States v. Sokolow* (1989) 490 U.S. 1, 7; *Gates*, *supra*, 462 U.S. at p. 238.)

### C.    INFORMANT'S TIP

The United States Supreme Court in *Gates* confirmed that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." (*Gates*, *supra*, 462 U.S. at p. 230.) To the degree these foundational elements of a tip are undetermined or withheld, corroboration in other respects is critical. (See *id*. at p. 241 [courts "have consistently recognized the value of corroboration of details of an informant's tip by independent police work"].) As our high court has observed, " '[A] deficiency in one [of these factors] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.' " (*People v. Camarella* (1991) 54 Cal.3d 592, 601, quoting *Gates*, *supra*, at p. 233.)

In order for corroboration of an untested or unreliable informant's tip to be adequate, California courts emphasize that "it must pertain to the alleged criminal activity; accuracy of information regarding the suspect generally is insufficient. [Citation.] Courts take a dim view of the significance of 'pedestrian facts' such as a suspect's physical description, his residence and his vehicles." (*People v. Johnson* (1990) 220 Cal.App.3d 742, 749, disapproved on another point in *People v. Camarella*, *supra*, 54 Cal.3d at p. 606, fn. 6; *People v. Gotfried* (2003) 107 Cal.App.4th 254, 264 (*Gotfried*).)

Yet we recognize that "corroboration is sufficient if police investigation has uncovered probative indications of criminal activity along the lines suggested by the informant. [Citation.] Even observations of seemingly innocent activity provide

sufficient corroboration if the anonymous tip casts the activity in a suspicious light."
(*People v. Johnson*, *supra*, 220 Cal.App.3d at p. 749, citing *Gates*, *supra*, 462 U.S. at
p. 244.) *Gates* elaborated on this point, explaining that "probable cause requires only a
probability or substantial chance of criminal activity, not an actual showing of such
activity. . . ." (*Gates*, *supra*, at p. 244, fn. 13.) "In making a determination of probable
cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but
the degree of suspicion that attaches to particular types of noncriminal acts." (*Ibid*.)

### D.    ANALYSIS

The facts and circumstances known to the officers at the time of Thomas's arrest
may be summarized as:  (1) Detective Thompson's knowledge based on training and
experience that this was a high-traffic location for illegal drugs in Santa Clara;
(2) Detective Thompson's receipt of a detailed, predictive tip from a confidential
informant; and (3) Detective Thompson's corroboration of the predictive details of the
tip, apart from the presence of drugs, namely:  the color and general type of van; the age,
hair length, skin color, and sex of the driver; the van's arrival at the specified parking lot;
and the van's arrival at the specified time, 3:15 p.m.  Insofar as the trial court also
considered "the essential plan of the drug exchange" as a corroborated fact, we disregard
it as unsupported by substantial evidence.  The record contained no information about the
informant's identity, reliability, or the source of his or her knowledge.

Gates lays the groundwork for our analysis of whether the totality of this
information, balanced against the baseline of the confidential informant's tip, was
sufficient to furnish probable cause for the arrest.

In *Gates*, an anonymous letter to the police department identified a couple, Sue
and Lance Gates, as drug dealers, and offered detailed information about their operation,
apartment location, and the value and location of their drugs.  (*Gates*, *supra*, 462 U.S. at
p. 225.)  The letter reported that Sue would drive the family car to Florida to be loaded
with drugs; Lance would fly down and drive the car back, and Sue would fly back

11

separately. The letter indicated that Sue would make a trip to Florida on May 3. (*Ibid.*) The police investigated and learned that " 'L. Gates' " had a flight reservation to West Palm Beach, Florida on May 5. (*Id.* at p. 226.) Surveillance confirmed that he boarded the flight, checked into a hotel room registered to Susan Gates, and left early the next morning with a woman in a vehicle with Illinois license plates, on an interstate headed in the direction of Chicago. (*Ibid.*) The investigating officer secured a search warrant for the Gateses' residence and car. (*Ibid.*)

The Supreme Court found that even though the anonymous letter contained virtually no indicia of reliability and, standing alone, would form an insufficient basis for a probable cause finding, the magistrate "could rely on the anonymous letter, which had been corroborated in major part" by police efforts. (*Gates*, *supra*, 462 U.S. at p. 243.) The facts obtained through the independent police investigation—including Lance Gates' quick turnaround stay of one night in a motel and immediate return toward Chicago in the family car that was "conveniently awaiting him in West Palm Beach"—alone suggested involvement in drug-trafficking. (*Ibid.*) Echoing the reasoning of *Draper v. United States* (1959) 358 U.S. 307 (*Draper*) on the value of corroborating predictive facts, the Supreme Court explained: "[T]he anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. . . . If the informant had access to accurate information of this type a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gateses' alleged illegal activities." (*Gates*, *supra*, at p. 245.)

*Draper*, like *Gates* and the present case, involved a tip predicting illegal drug activity. The tip in *Draper*, however, came from a known, paid informant who previously had provided accurate information to the police. (*Draper*, *supra*, 358 U.S. at p. 309.) The informant identified by name and address an individual who allegedly was peddling drugs and would arrive from Chicago by train on one of two days carrying three

ounces of heroin. The informant described the suspect and predicted he would be wearing a raincoat, brown slacks and black shoes, carrying a tan zipper bag, and walking fast. (*Ibid*., fn. 2.) The police observed an individual "having the exact physical attributes and wearing the precise clothing" exit a Chicago train on the second of the two dates; he had a tan zipper bag and walked fast. (*Id*. at p. 309.) The officers arrested the suspect and seized the heroin. (*Id*. at p. 310.)

The Supreme Court affirmed the conviction. (*Draper*, *supra*, 358 U.S. at p. 314.) Even though the informant's source of information was not known, the court credited the informant's provision of accurate and reliable information in the past, along with the investigating officer's corroborative efforts. (*Id*. at pp. 312-313.) The court concluded that because the officer had "personally verified every facet of" information in the tip, except for whether the defendant was transporting heroin, the officer "had 'reasonable grounds' to believe that the remaining unverified bit of . . . information—that Draper would have the heroin with him—was likewise true." (*Id*. at p. 313.)

We find the corroborated, predictive information provided by Detective Thompson's informant was comparable to that provided by the known informant in *Draper*. While the tip in *Draper* originated with a " 'special employee' " (*Draper*, *supra*, 358 U.S. at pp. 312-313) of the narcotics agent "whose information had always been found accurate and reliable . . . ." (*id*. at p. 313), the predictive accuracy here reasonably permits a similar conclusion as to the reliability of the informant's tip. Although the information provided to Detective Thompson was less extensive than that provided in *Gates*, like in *Gates*, the independent investigation accurately corroborated a range of predictive details in a narrow timeframe that only a person with close access to the planned illegal activity could have known. (*Gates*, *supra*, 462 U.S. at p. 245.)

Of course, Thomas's conduct driving into the Safeway parking lot, parking, and exiting the van, without more, suggested only innocent behavior. But the unlikely fact that he would do so immediately following and in the exact manner described by the

13

confidential informant, when considered together with the detective's firsthand knowledge of the parking lot as a hotspot for drug trafficking, attached more than a minimal degree of suspicion to his arrival. As the People point out, the informant's tip was "fresh" or not based on stale information. Detective Thompson's immediate corroboration of the information predicted in the tip created an effect tantamount to that of a report of a crime underway or just completed. (See *People v. Dolly* (2007) 40 Cal.4th 458, 468 ["[t]he police 'may ascribe greater reliability to a tip, even an anonymous one, where an informant "was reporting what he had observed moments ago," not stale or second-hand information.' "].) Thus, the precise timing of the events that followed the tip provided a " 'probative indication[] of criminal activity along the lines suggested by the informant.' " (*Gotfried*, *supra*, 107 Cal.App.4th at p. 264, quoting *People v. Johnson*, *supra*, 220 Cal.App.3d at p. 749; see also *Gates*, *supra*, 462 U.S. at p. 244, fn. 13.)

Thomas offers two California Court of Appeal decisions in support of his contention that the sum of the facts here was not enough to sustain the arrest. Both are distinguishable.

In *People v. Lissauer* (1985) 169 Cal.App.3d 413 (*Lissauer*), police learned from an informant with an undisclosed criminal record that a man who lived in Marin County allegedly was going to deliver 10 pounds of marijuana to San Francisco at a certain time and date. (*Id.* at p. 417.) The informant provided a first name, telephone number, physical description of the man and his car, and where he kept his marijuana. Using the telephone number, the police corroborated the defendant's name, address, and resemblance to the informant's description, and followed the car as it left Marin County at approximately the time predicted by the informant and drove into San Francisco, where the police arrested the defendant. (*Id.* at p. 423.) The court rejected the sufficiency of these facts and circumstances as a basis for probable cause, explaining: "While observation of innocent activities can provide sufficient corroboration of an unknown or

14

untested informant's tip to establish probable cause [citations], the 'veracity' and 'basis of knowledge' of the informant must be assessed together with all the circumstances to determine whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*Id*. at p. 422, quoting *Gates*, *supra*, 462 U.S. at p. 238.)

As noted above, the tip and predicted activity in this case came in such quick succession that its corroboration levied suspicion on the otherwise innocent behavior. But in *Lissauer*, the tip offered a broad sweep of information, all of which the court reasoned "was such as could be acquired by any casual observer" such that "[t]he independent investigation by the police revealed nothing which was even remotely suspicious." (*Lissauer*, *supra*, 169 Cal.App.3d at p. 423.)  In addition, the *Lissauer* court found that the informant's status as an arrestee " 'made to work' " for the police (*id*. at p. 417) rendered the information suspect.  (*Id*. at p. 423.)  The court further found that Marin County had "no reputation as an import center for illegal drugs" (*ibid*.), in contrast with evidence here and in *Gates* that the alleged illegal conduct would occur in an area known for drug-related activity.  (*Gates*, *supra*, 462 U.S. at p. 243 [Florida a known destination for illegal drug trade].)

Thomas also relies on *People v. French* (2011) 201 Cal.App.4th 1307 (*French*), in which police obtained a search warrant based on information from three informants who independently tipped a police officer about alleged drug sales at a particular residence. (*Id*. at pp. 1311-1312.)  The first informant was an arrestee who stated that his wife bought heroin from the residence, pointed out the house, and described the suspect's car. (*Id*. at p. 1312.)  The second informant, whose source of information was unstated, offered additional details about the suspect and his girlfriend, who allegedly also sold drugs from the residence.  (*Id*. at pp. 1312-1313.)  The third informant, who had provided corroborated information to law enforcement before, claimed to have been in the suspect's house and to have observed people coming and going, who the informant believed were buying drugs.  (*Id*. at p. 1313.)  Independent police investigation obtained

15

vehicle registration and criminal histories, revealing that the suspect's girlfriend had multiple arrests and convictions for possession and sale of illegal substances. (*Ibid*.)

On appeal, the court determined the warrant affidavit failed to establish probable cause. (*French*, *supra*, 201 Cal.App.4th at p. 1323.) The court found the informants' conclusory assertions of criminal wrongdoing lacked any indicia of reliability (*id*. at pp. 1316-1318), among other reasons because the informants offered no predictive information that the police could corroborate to substantiate the reliability of the tip. (*Id*. at p. 1320.) (Cf. *Gates*, *supra*, 462 U.S. at p. 244 [unknown informant "became far less significant" after officer's independent investigative work substantially corroborated the letter's predictions].) The girlfriend's criminal history failed to state the time frame or relevance of the prior arrests and convictions. (*French*, *supra*, at p. 1321.) And the "interlocking statements" (*ibid*.) of each informant failed to provide probable cause: "[I]t would be illogical to conclude multiple unreliable informants, whose statements interlock only on pedestrian details, sufficiently corroborate each other to justify issuance of a warrant." (*Id*. at pp. 1321-1322.) In contrast here, the confluence of the predictive tip, quickly corroborated by the police stakeout, and the detective's knowledge of the location, provided such indicia of reliability as was lacking in *French*.

The People cite several cases in support of the probable cause finding, which Thomas argues are readily distinguishable. We note that while each case is factually distinguishable, taken together they illustrate that "probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." (*Gates*, *supra*, 462 U.S. at p. 232.)

16

Thus, in *People v. Kershaw* (1983) 147 Cal.App.3d 750,[5] the court determined that a search warrant application was supported by probable cause after police corroborated not only the innocent facts in an anonymous informant's detailed statement (i.e., suspect's name, street address, telephone number, and vehicle) but also investigated the defendant's arrest and warrant record and conducted surveillance of the defendant's home, during which time the police observed activities consistent with drug trafficking. In *People v. Ramirez* (1984) 162 Cal.App.3d 70, a "confidential reliable informant" (*id.* at p. 73) reported personally meeting an individual who was delivering drugs to customers; the informant described the suspect's appearance, location, and mode of conducting drug sales. (*Id.* at pp. 73-74.) The investigating officer corroborated those details, including by following the defendant's movements over a five-hour period, thereby discovering additional information about the defendant before seeking a warrant to search the defendant's apartment. (*Id.* at p. 74.) And in *People v. Rosales* (1987) 192 Cal.App.3d 759, 766, an unidentified caller during a murder investigation claimed to have been present in the victims' house when the drive-by shooting occurred and provided information about the gang members allegedly involved in the shooting. Several investigating officers familiar with the street gang corroborated certain information from the tip and applied their collective knowledge of the individuals involved to follow up, ultimately arresting the defendant as he tried to flee. (*Id.* at p. 768.)

While the extent of independent police investigation and surveillance in *People v. Kershaw* and *People v. Ramirez* was greater than here, as was the amount of information about the crime and the suspect in *People v. Rosales*, the level of suspicion resulting

---

[5] The court in *People v. Kershaw* analyzed probable cause under the more exacting, pre-*Gates* standard, but noted that the application of *Gates* would not have changed the outcome. (*People v. Kershaw*, *supra*, 147 Cal.App.3d at p. 754, fn. 2.)

from the totality of facts and circumstances known to the officers was not. Thomas's arrival at the Safeway parking lot precisely as anticipated by the informant's tip suggested that the tip could be reliable, insofar as it was substantially corroborated in relation to the future behavior of a third party. (*Gates*, *supra*, 462 U.S. at p. 245; *Draper*, *supra*, 358 U.S. at p. 313.) The temporal alignment of the prediction and corroboration further eliminated doubt about the reliability of the tip or veracity of the confidential informant. And Detective Thompson's familiarity with the Santa Clara Safeway parking lot as a hot spot for drug trafficking further bolstered the level of suspicion that arose from the tip. Under the totality of these circumstances, there was reasonable cause for belief that the person to be arrested was committing a drug crime (*Celis*, *supra*, 33 Cal.4th at p. 673) and of at least " 'a fair probability' " that evidence of that crime would be found. (*United States v. Sokolow*, *supra*, 490 U.S. at p. 7.)

Having concluded there was probable cause to support Thomas's arrest, the subsequent search of Thomas's pockets and the van were authorized each as a search-incident-to-arrest exception to the warrant requirement.[6] (See *United States v. Robinson* (1973) 414 U.S. 218, 224 [search of arrestee incident to lawful arrest is a settled exception to the warrant requirement]; *Arizona v. Gant*, *supra*, 556 U.S. at p. 338 [police may search a vehicle incident to the recent occupant's arrest if it is reasonable to believe the vehicle contains evidence of the offense of arrest].)

### III.    DISPOSITION

The judgment is affirmed.

---

[6] Thomas does not contend otherwise, relying instead on his argument that the underlying arrest was unlawful and therefore the search-incident-to-arrest exceptions inapplicable.

_____
                          Premo, J.

WE CONCUR:



_____
         Rushing, P.J.




_____
          Grover, J.




People v. Thomas
H041856